[Crim. No. 253.   Third Appellate District.—September 10, 1914.]

# THE PEOPLE, Respondent, v. RICHARD FORD, Appellant.

CRIMINAL LAW—HOMICIDE—CHANGE OF VENUE—ESSENTIALS OF AFFIDAVIT.—The affidavit in support of an application for a change of venue in a homicide case, on the ground of local prejudice and bias of the judge, should not stop with stating conclusions; it must state facts, and the facts stated must be sufficient to convince a reasonable mind that the opinion of the affiant is well founded.

ID.—AFFIDAVIT FOR CHANGE OF VENUE—WHEN INSUFFICIENT.—An affidavit in a homicide case which merely alleges that friendly relations existed between the judge and the deceased, that the latter was a popular public officer, that the mind of the public is inflamed against the defendant, and that the person in relation to whose property and affairs the homicide occurred is a wealthy and widely known landowner, without setting forth more facts showing bias and prejudice calculated to interfere with a fair trial, is insufficient to sustain an application for a change of venue.

ID.—HOMICIDE—INDICTMENT IN LANGUAGE OF STATUTE—PROOF OF CONSPIRACY.—Where an indictment charges several persons with murder in the language of the statute, evidence is admissible to show a conspiracy between them, it appearing that the homicide was committed while, they were engaged in the commission of an unlawful act. Proof of the conspiracy is not made to establish another and distinct crime—that is, conspiracy as such—but to show the circumstances under which the homicide was committed and that the acts were unlawful in the commission of which the killing resulted.

ID.—CONSPIRACY RESULTING IN HOMICIDE—PRINCIPALS AND ACCESSORIES. Where one person unites with one or more other persons in an enterprise to commit an unlawful act, whether a felony or misdemeanor, with the intention to withstand all opposition by force, and is present aiding and abetting the deed, and murder is committed by some one of the party in pursuance of the original design, or the unlawful act results in death, he is guilty as the principal or immediate offender.

ID.—RESPONSIBILITY OF CONSPIRATORS—ACT NOT ORIGINALLY INTENDED. In such case each conspirator is responsible criminally for the acts of the others, done in furtherance of the common design, although such acts were not intended as part of the original plan.

ID.—RESISTING ARREST BY STRIKING LABOR LEADER—INCITING OTHERS TO ASSIST—HOMICIDE BY CONSPIRATORS.—If it is shown in a prosecution for homicide that the defendant, as the leader of a large number of striking hop pickers, unlawfully resisted arrest, and, by

inciting those under his leadership to assist him in such unlawful act, a homicide resulted through the act of one or more of them, the jury may properly be instructed that where several persons conspire or combine together to commit any unlawful act, each is criminally · responsible for the acts of his associates or confederates, committed in furtherance of any prosecution of the common design for which they combine.

Id.—Lawfulness of Strike—Refusal to Instruct Jury Regarding. In such prosecution the court properly refuses to instruct the jury on the lawfulness of striking, picketing, and boycotting, when the evidence does not show that the conspirators were engaged in such acts when the homicide occurred, although the officers who were killed might not have been present had it not been for a strike.

Id.—Felonies or Misdemeanors—No Distinction Between Conspiracies to Commit.—The law makes no distinction between conspiracies to commit misdemeanors and conspiracies to commit felonies, and a homicide perpetrated in furtherance of a conspiracy to commit a breach of the peace, or to resist an officer in the discharge of his official duty, is murder as well as a homicide committed in furtherance of a conspiracy to commit a felony.

Id.—Homicide—Implied Malice—Absence of Consideration of Provocation.—Any unlawful killing of a human being, with malice aforethought, express or implied, is murder. Malice is implied when no considerable provocation appears.

Id.—Guilt of Accused as Principal—Sufficiency of Evidence to Support Verdict.—In this prosecution of the leader of striking laborers for murder in resisting arrest, the jury is justified from the evidence in finding him guilty as a principal although he did not himself fire the fatal shot.

Id.—Evidence—Distinction Between Confessions and Admissions.— A distinction exists, in legal contemplation, between admissions and confessions; a confession in criminal law is the voluntary declaration made by a person who has committed a crime or misdemeanor, to another, of the agency or participation he had in the same. It is restricted to acknowledgment of guilt.

Id.—Admissibility of Admission—Tendency to Establish Guilt—Preliminary Proof.—An admission of a fact, not in itself involving criminal intent, is not to be rejected as evidence, without preliminary proof, merely because it may, when considered with other facts, tend to establish guilt.

Id.—Declarations of Accused—Effect of Duress.—Declarations of a person accused of crime, which are not confessions of guilt, cannot be objected to as obtained under duress.

Id.—Confessions—Caution in Admitting—Weight as Evidence.— While confessions are to be received with caution, yet when the admission is deliberately made and precisely identified, the evidence it affords is of the most satisfactory nature.

ID.—CONFESSION—CORROBORATION—PROOFS OF CORPUS DELICTI.—Where the *corpus delicti* is otherwise satisfactorily proved, a defendant may be convicted on his uncorroborated confession; proof of the *corpus delicti* may be considered as a circumstance sufficiently corroborating a confession.

ID.—DOCTRINE OF REASONABLE DOUBT—INSTRUCTION TO JURY.—A suggestion to the jury, in giving an approved instruction upon the doctrine of reasonable doubt, that the term "reasonable doubt" is "probably pretty well understood but not easily defined," is unnecessary but harmless.

ID.—INSTRUCTION ON REASONABLE DOUBT—HARMLESS OMISSION.—The omission to state, at the end of an instruction on the question of reasonable doubt, that the jury may not convict unless the evidence convinces them beyond a reasonable doubt, is not prejudicial error if this admonition occurs frequently in other instructions.

ID.—WITNESS FALSE IN PART—INSTRUCTIONS.—An instruction to the jury that "you have a right to disregard entirely the testimony of any witness whom you believe to have willfully testified falsely," is properly refused, as failing to use the necessary qualifying words "in a material matter," especially if the court elsewhere instructs the jury that "a witness willfully false in one part of his testimony is to be distrusted in others."

APPEAL from a judgment of the Superior Court of Yuba County and from an order refusing a new trial. Eugene P. McDaniel, Judge.

The facts are stated in the opinion of the court.

R. M. Royce, and Austin Lewis, for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

THE COURT.—An indictment was returned, September 8, 1913, against the defendant for the murder of E. T. Manwell on the third day of August, 1913, at the county of Yuba. On October 30, 1913, H. D. Suhr was indicted and, still later, November 4, 1913, William Beck and Harry Bagan were jointly indicted, all for the same crime. By stipulation all the defendants were tried jointly. Beck and Bagan were acquitted and Ford and Suhr were convicted of murder in the second degree and each was sentenced to imprisonment for life in the state's prison. The record in case No. 253 presents the appeal of defendant Ford from the judgment of conviction

and from the order denying his motion for a new trial. By stipulation the appeal of defendant Suhr, No. 254, is to be heard upon the transcript brought up in No. 253.

1. On November 28, 1913, defendant Ford made a motion "for an order transferring this cause to some convenient county for trial and that some judge other than the Honorable Eugene P. McDaniel hear the same." The ground of the motion was that the defendant cannot have a fair trial in Yuba County "by reason of the bias and prejudice and high feeling against the said defendant, and that the said judge by reason of bias and prejudice is disqualified from hearing said cause. Said motion will be based upon the affidavit of said defendant Richard Ford." A like motion was made on behalf of defendant Suhr supported by his affidavit alleging substantially the same facts as were set forth by defendant Ford and both motions were heard at the same time. On behalf of the people counter affidavits of E. B. Stanwood, district attorney, and Eugene P. McDaniel, judge of the superior court of Yuba County, were read in resistance of the motion. Both motions were denied.

The affidavit of Ford states that Manwell, district attorney, and one Reardon, deputy sheriff of Yuba County, died of gunshot wounds; that Sheriff Voss, a deputy sheriff, and Constable Anderson were beaten and injured; that two of the hoppickers were killed and the arm of a man by the name of Nielsen was shot off by deputy sheriff Daken; that Manwell was widely and favorably known in the county and was a personal friend of Judge McDaniel; that district attorney Stanwood was a personal friend of Manwell and was his assistant district attorney and the present district attorney is a son of Manwell; that said sheriff and Daken and Anderson were very popular in the county; that, on August 2, 1913, the employees on the Durst hop-ranch, near Wheatland, some twenty-three hundred in number, had protested against the unsanitary and intolerable conditions of the camp, specifying the particulars as to such conditions; that Ford was selected by the hop-pickers as spokesman to present their grievances and, at about 5 o'clock on Sunday, August 3, 1913, said employees were holding a peaceful meeting on said ranch and said sheriff, Anderson, Armstead, Reardon, and others, with Manwell, some of whom were armed, entered said assemblage; that a disturbance ensued and as to the fatal results and the

responsibility therefor, the facts are in dispute; that Durst is a large landowner, rich and widely known; that later eight persons were arrested at Wheatland and were taken to Marysville by the state militia, "to prevent being lynched by the people of Yuba County and the people of Yuba County are biased and prejudiced against said defendant"; that district attorney Stanwood has arrested many persons "without bringing them before a magistrate for periods running from thirty days to three months with the approval of the community" and that detectives were employed who made efforts to compel said persons so arrested "to swear to facts tending to convict some one of murder"; that the issues of fact at the trial of defendant involve the general condition of labor on ranches in the county and the veracity of said Durst and said sheriff and constables and other officers and their acts are involved in the case; that said Stanwood is widely known in said county and has many personal friends and the propriety of his conduct and his fitness for his office are also issues in the case; "that Yuba County is a rural county and the people generally know one another and most of the people know all of the aforesaid parties" and are the friends of said parties; that the witnesses for the prosecution are many of them residents of said county and well and favorably known and this defendant and many of his witnesses are strangers in said county and unknown and "some of defendant's witnesses are afraid to come to Marysville to testify in defendant's behalf."

District Attorney Stanwood made affidavit: That he is well acquainted throughout the county and with the people thereof; that since said August 3, 1913, he has had charge of the prosecution of defendant, has interviewed witnesses and conducted the investigation up to the present time; that affiant has tried many of the criminal cases and mingled largely with the people of said county "and at no time has affiant discovered or learned of any sentiment or prejudice among the people of Yuba County against any defendant" and affiant, on information and belief, "alleges the fact to be that there is in Yuba County, and among the people thereof, no prejudice or bias against said defendant whatsoever" and defendant "can have in said county, before any jury that may be selected, an absolutely fair and impartial trial"; that there is and was nothing in the relationship between affiant and said Manwell or that existing with his son, or any other reason or cause

"which has biased or prejudiced this affiant against defendant, nor does this affiant at this time entertain the slightest bias or prejudice against him''; that nothing in affiant's friendship for Sheriff Voss in any way affects affiant to defendant's prejudice and affiant says that he is informed and believes that said Sheriff Voss at no time has entertained any bias or prejudice against defendant and it is a fact that said sheriff and said deputies referred to in defendant's affidavit are well and favorably known in the county, "but there is nothing in said acquaintanceship or knowledge which in any way has biased or will bias or prejudice any of the people of said county against defendant upon his trial in the above-entitled action or in any way at all''; that two companies of militia were, shortly after August 3, 1913, "called to the scene of the killing for the purpose of restoring peace and order thereat and for no other purpose; that eight or more persons arrested at said time were escorted to Marysville by certain members of the militia solely for the reason that there did not happen to be at hand sufficient peace officers for that purpose; that, however, they were not so escorted for the purpose of protecting them from violence; and as a matter of fact, there was no manifestation of any ill-feeling or violence against any of said persons or against any person, at or after the killing of said Manwell and Reardon, by any of the people of said Yuba County; that affiant "has caused several persons to be arrested and confined for a certain time and thereafter has caused several persons thus arrested to be released after a full and fair investigation''; that certain detectives were employed but at no time did affiant "do or advise the doing of any act or acts except as were entirely necessary, legal and proper in the premises''; affiant denies that the issues of fact at the trial can be made to involve any general or other condition of labor on the ranches of Yuba County and he denies that the involving of such conditions would in any way tend to prejudice any of the people of Yuba County against the defendant; that affiant has known Judge McDaniel intimately for twenty years and, since said August 3, 1913, "he has frequently heard said judge make expressions concerning matters involved, and which necessarily will become involved upon the trial of said action; that at no time has he heard said judge express any sentiments, directly or indirectly tending to show the existence in his mind of the slightest bias or

prejudice against the above named defendant or his case
. . . and affiant alleges that said judge is in no way biased or
prejudiced against said defendant, and defendant can have
before him an absolutely fair and impartial trial.''

Judge McDaniel made affidavit: That Manwell was person-
ally known to and a friend of affiant; that nothing in the
acquaintance of affiant with Manwell ''in any way affects
affiant as such judge and the same in no way produces in the
mind of affiant any prejudice toward the defendant in this
action; affiant, as such judge, can sit and preside upon the
trial of this action as fairly and as unbiased as he could in
any criminal action whatsoever; . . affiant has at no time had,
nor has he now, any bias or prejudice against defendant either
resulting from affiant's friendship for said Manwell or from
his sharing in any general sentiment of the community in said
Yuba County, or for any reason or in any way at all; affiant
has no knowledge at this time of the existence of any preju-
dice or feeling among the people or the community in said
Yuba County, against defendant''; that nothing in affiant's
acquaintance with and friendship for Sheriff Voss can in any
way affect affiant as a judge or will have any bearing on his
actions in said case or in any way cause any prejudice or bias
in the mind of affiant against defendant; that he has read the
affidavit of defendant and that ''neither from any matters in
said affidavit set out nor for any cause or reason whatsoever
does he entertain any bias or prejudice whatsoever against the
defendant.''

There is much in Ford's affidavit concerning the intimate
and friendly relations existing between the district attorney
and the judge and the parties named that might be said in
almost any criminal case arising in the county. The popu-
larity of an official can hardly be taken as evidence, certainly
not as conclusive, that a fair and impartial trial could not be
given a defendant who had assaulted or even killed such
official. Ordinarily where there is an existing highly inflamed
condition of the public mind prejudicial to a person charged
with crime, it finds some manifestation through the public
press, or by assemblages of the people in the neighborhood of
the scene of the crime, and, if general, in other parts of the
county. We have here no evidence that the people of Yuba
County had, even to a limited extent, shown any feeling of
passion or prejudice toward Ford or any of the defendants

or had manifested any disposition to prejudge the merits of the case. Ford's statement that such was the condition of the public mind toward him is but his conclusion which is expressly denied by the counter affidavits. In *People* v. *Lindley*, 132 Cal. 304, [64 Pac. 472], the court said: "It is not sufficient, in a case of this kind, to allege in the affidavit simply that the defendant 'believes that he cannot have a fair and impartial trial,' etc., but it must be made to appear by the affidavit or affidavits on file that a fair and impartial trial cannot be had before the judge about to try the case, by reason of the bias and prejudice of such judge. (Code Civ. Proc., sec. 170, subd. 4.) The affidavit or affidavits must not only state facts, but the facts stated must establish to the satisfaction of a reasonable mind that the judge has a bias or prejudice that will in all probability prevent him from dealing fairly with the defendant." The same is true in respect of alleged bias and prejudice of the people at large. Some facts should appear which would convince a reasonable mind that the opinion of the affiant is well founded.

A jury was obtained, apparently, without any great delay or difficulty and defendant did not exercise all the peremptory challenges to which he was entitled.

The statement that the case involved the general condition of farm labor and wages in the county carries with it no inference that the subject will in any way cloud the real issues in the case or be likely to prejudice farmers, should any of that class be chosen as jurymen, against the defendant. Besides, the counter affidavits deny that any such issue would be involved and we cannot see that it could have been, as in fact it was not. Nor can we attach significance to the statement that Mr. Durst "is a large landowner, and a very rich man and widely known in Yuba County." There is no showing that his wealth or that the knowledge of the people of the county had of him could in any way have interfered with defendant's having a fair and impartial trial.

Without noticing in further detail the averments of Ford's affidavit, we think such of them as have any essential bearing upon his claim that he could not have a fair and impartial trial in Yuba County or before Judge McDaniel, are substantially controverted in the counter affidavits. The facts presented in a similar motion, in *People* v. *Susser*, 132 Cal. 631, [64 Pac. 1095], were so very different from the facts here

shown as to make that case of little value in the determination of the present question. We think the order denying the motion for a change of the place of trial was rightly made.

2. Some questions are discussed in appellant's brief that may be disposed of before reaching the more important contention—that the evidence is insufficient to justify the verdict. For a proper understanding of defendant's points now to be noticed, it may be stated that there was no evidence that Ford fired the shot which resulted in Manwell's death, although the confession of Suhr might give rise to an inference that he may have done so. The contention of defendant is thus stated:

"As it is admitted that neither Ford nor Suhr fired the fatal shot" (we find no such admission as to Suhr), "it was very important to correctly charge as to the illegality of the acts or words from which it was sought to hold them guilty of Manwell's death. The acts and words we submit should have been pleaded. The question as to their illegality was one of law for the court. The issue of fact was, were the acts done or words spoken, and what was their effect or result?" As we understand defendant's position, it is that defendant was at most engaged in conducting a strike, which was not an unlawful act, or that if he was committing a trespass it was but a misdemeanor; that whatever his acts or his words spoken which may have led to the killing they should have been alleged and, as his acts and words concerned only an undertaking not unlawful, or if unlawful, was but a misdemeanor, the killing as matter of law must be held not to have been murder in either degree; that unless defendant's acts and words constituted a felony he could not be held for murder because they resulted in the death of some one and at most his offense would be manslaughter because lacking the essential elements of murder. It is hence contended: 1. That evidence of a conspiracy was not admissible and cannot be considered because the conspiracy was not pleaded; and, 2. That evidence which fell short of showing a conspiracy to commit a felony would not support the verdict. We confess to some difficulty in discovering precisely defendant's contention but have given it as we understand it. The indictment was for murder and was charged in the language of the statute. We entertain no doubt as to the admissibility of evidence of a conspiracy under such an indictment where the murder was committed while the conspirators were engaged in the

consummation of some other unlawful act.   Proof of the conspiracy is not made to establish another and distinct crime—that is, conspiracy as such—but to show the circumstances under which the homicide was committed and that the acts were unlawful in the commission of which the killing resulted. *People* v. *Brown,* 59 Cal. 345, and *People* v. *Kauffman,* 152 Cal. 331, [92 Pac. 861], were cases (many others might be cited) where the charge was murder and evidence was taken of a conspiracy to do an unlawful act.   Upon the question of the responsibility for the acts of the conspirators we conceive the law to be—that where one person unites with one or more other persons in an enterprise to commit an unlawful act, whether a felony or misdemeanor, with the intention to withstand all opposition by force, and is present aiding and abetting the deed, and murder is committed by some one of the party in pursuance of the original design, or the unlawful act results in death, he is guilty as the principal or immediate offender.   (*State* v. *Nash,* 7 Iowa, 347, 350; *Spies* v. *People,* 122 Ill. 1, [3 Am. St. Rep. 320, 12 N. E. 865, 17 N. E. 898].) In the Spies case it was said, at page 177 (of 122 Ill.): "Where persons combine to stand by one another in a breach of the peace, with a general resolution to resist all opposers, and in the execution of their design, a murder is committed, all of the company are equally principals in the murder though at the time of the act some of them were at such a distance as to be out of view, if the murder be in furtherance of the common design."   At page 225 (of 122 Ill.) it was said: "A man may be guilty of a wrong which he did not specifically intend, if it came naturally, or even accidentally from some specific or general evil purpose.   When, therefore, persons combine to do an unlawful thing, if the act of one proceeding according to the common plan terminates in a criminal result, though not the particular result meant, all are liable."   And again: "There might be no special malice against the party slain nor deliberate intention to hurt him; but if the act was committed in prosecution of the original purpose, which was unlawful, the whole party will be involved in the guilt of him who gave the blow.   Where there is a conspiracy to accomplish an unlawful purpose, and the means are not specifically agreed upon or understood, each conspirator becomes responsible for the means used by any conspirator in the accomplishment of the purpose in which they

are all at the time engaged.'' And it was held, in *Ruloff* v. *People,* 45 N. Y. 213, 217: ''This general resolution of the confederates need not be proved by direct evidence. It may be inferred from circumstances, by the number, aims and behavior of the parties at or before the scene of action.'' (See *People* v. *Donnelly,* 143 Cal. 394, [77 Pac. 177].)

The principle governing conspiracies is well stated in *People* v. *Brown,* 59 Cal. 345, 352, and, although the conspiracy there was to commit a felony, we do not think that the grade of the crime involved in the conspiracy is material if the act or design is unlawful. It was said, in *People* v. *Kauffman,* 152 Cal. 331, 335, [92 Pac. 861, 862]: ''But whether or not the act committed was the ordinary and probable effect of the common design or whether it was a fresh and independent product of the mind of one of the conspirators, outside of, or foreign to, the common design, is a question of fact for the jury (citing cases), and if there be evidence to support the finding of the jury on this question its determination is conclusive.''

It was not the theory of the prosecution, as claimed by defendant, ''that every labor leader is responsible for all the acts of striking workmen, and that each labor leader can be tried under an indictment baldly stating that the said labor leader has personally done a specific thing, in this case murder, whereas, in fact, it is sought to hold him responsible for the act of another.'' The theory of the prosecution was that Ford, as the leader in this instance, was engaged in the unlawful act of resisting arrest by a peace officer armed with a lawful warrant and that by his words and acts he incited the persons then under his leadership to aid and assist him in such unlawful act and that Manwell met his death through the act of one or more of these conspirators thereunto induced by Ford. Appellant cites subdivision 2, section 192 of the Penal Code and *People* v. *Munn,* 65 Cal. 215, [3 Pac. 653], to show that instruction numbered 48, presently to be noticed, was incorrect, and to establish the proposition that the killing of Manwell was, at most, but manslaughter. The section of the code defines involuntary manslaughter to be—''in the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection.'' In the Munn case ''the defendant was con-

victed of the crime of murder of the second degree. The evidence showed that he struck the deceased two or three blows with his fist, from which death ensued. It was not shown that he intended to kill deceased, but the court instructed the jury that he was liable for all *possible* consequences of his act. *Held,* error. (Syllabus.) In that case the court quoted the language of Chief Justice Shaw, in *Commonwealth* v. *Webster,* 5 Cush. (Mass.) 305, [52 Am. Dec. 711], as follows: "This rule is founded on the plain and obvious principle that a person must be presumed to intend to do that which he voluntarily and willfully does in fact do, and that he must intend all the natural, probable, and usual consequences of his own act." The instruction given by the trial court stated the rule correctly to a certain point but added that if the act intended was unlawful the defendant would be responsible "for all the consequences, even the *possible* consequences." The instruction (numbered 48) given in the present case was as follows: "I instruct you that where several persons conspire or combine together to commit any unlawful act, each is criminally responsible for the acts of his associates or confederates committed in furtherance of any prosecution of the common design for which they combine. In contemplation of law the act of one is the act of all. Each is responsible for everything done by his confederates, which follows incidentally in the execution of the common design as one of its probable and natural consequences, even though it was not intended as a part of the original design or common plan."

This instruction is taken from a statement of "the rules of law governing the criminal liability of each of several parties engaging in an unlawful conspiracy or combination," said by the supreme court, in *People* v. *Kauffman,* 152 Cal. 331, 334, [92 Pac. 861, 862], to be "an apt statement of them (the rules), abundantly supported by authority," and found in 8 Cyc. 641. Appellant replies that in the Kauffman case the conspiracy was to commit a felony—robbery—and hence the case does not apply here. Appellant's error is in assuming that a distinction is made between conspiracies to commit misdemeanors and conspiracies to commit felonies. In short, his position is—that a homicide perpetrated in furtherance of a conspiracy to commit a felony is murder but that a homicide perpetrated in furtherance of a conspiracy to commit a breach of the peace, or to resist an officer in the dis-

charge of his official duty is nothing more than manslaughter. The law recognizes no such distinction. Sufficient of the evidence, tending to show that the unlawful act was in furtherance of which the murder was committed, will be hereafter stated. In this connection appellant complains of the refusal of the court to give the following instructions:

"I charge you as matter of law that a strike is lawful."

"I charge you as matter of law that a boycott is lawful."

"I charge you as matter of law that one or more men have a right to quit work for any reason, or no reason, or a frivolous reason, singly or in a body, and peaceably to picket, and peaceably to request or persuade others to do so, and to request others to assist them in so persuading and so picketing."

It is urged that under the instructions given the jury might have assumed that striking or picketing or boycotting was an unlawful act, and to prevent such assumption by the jury defendant was entitled to have the instructions given. There was no evidence that the killing occurred while the conspirators were in the act of striking, picketing, or boycotting. There was evidence that many of the hop-pickers quit work Sunday morning—on their part a strike; that a boycott was declared and was in operation early in the day against certain businesses being carried on in the camp—a store, a restaurant, a near-beer booth and a shooting gallery.

Manwell was killed at a meeting of hop-pickers held about five o'clock of that day under circumstances which will hereinafter be more fully set forth. Suffice it at this point to say that while it may be assumed that the hop-pickers were assembled at this meeting originally to consider or talk over their grievances, it soon, under the leadership of Ford, took on altogether a different complexion. He made it known to the people that the officers of the law were approaching with an intention to arrest him and he called upon his followers to stand by him and prevent his being taken. This they did promptly upon the coming of the officers into their midst and there quickly followed not only Manwell's death but other tragic and fatal happenings which showed that the sole purpose of the actors was to prevent Ford's arrest at all hazards. The tragedy may be said to have remotely had its orgin in the strike—that is, if there had been no strike there might have been no officers there and no occasion for their being there. But so far as the strike and the occurrences of the earlier

part of the day are concerned they became collateral to the events happening at 5 o'clock and immaterial to the issue being tried. (See *People* v. *Conkling,* 111 Cal. 616, [44 Pac. 314].) The legal right of the parties to strike was not an issue and furnished no justification for killing Manwell in their effort to protect their leader, Ford, from arrest.

Appellant presents a still further phase of this contention. He says that the verdict acquitted him of murder in the first degree; that there is no evidence warranting a conviction of manslaughter and hence there remained only murder of the second degree of which he could have been convicted, but "that the only possible justification for a verdict of murder. in the second degree would have been evidence that Manwell was killed in the perpetration or attempt to pertetrate some felony other than arson, rape, robbery, burglary or mayhem, but there is absolutely no evidence of any perpetration, or attempted perpetration of any felony whatsoever." The answer to this view of the law seems to be quite obvious. Murder in the first degree is specifically defined "and all other kinds of murders are of the second degree." (Pen. Code, sec. 189.) Manslaughter is not any kind of murder. So there must be murders which are not murders in the first degree. "Murder is the unlawful killing of a human being, with malice aforethought." (Pen. Code, sec. 187.) Any unlawful killing of a human being with malice aforethought is murder. The degree has nothing to do with the definition. But "such malice may be express or implied. . . . It is implied, when no considerable provocation appears." (Pen. Code, sec. 188.) If, then, the killing of Manwell was done in the absence of "considerable provocation," malice is implied and we have the very case provided for by the statute. It will be observed that the statute makes no distinction between cases where the killing was in the perpetration of a misdemeanor and of a felony; it says "all other kinds of murder are of the second degree"; that is, the unlawful killing of a human being with malice (express or implied) aforethought is murder, and the killing is equally unlawful whether done in the perpetration of a misdemeanor or felony.

3. It appears that, on Sunday, August 3, 1913, there were at the Durst ranch, near Wheatland, about two thousand or twenty-five hundred people, of several different nationalities, men, women, and children, gathered there to pick hops; the

hop-picking had begun about the middle of the preceding week; the unsanitary conditions surrounding these laborers, and some unnecessary hardships to which they were subjected in the performance of their work, naturally aroused a feeling among them of dissatisfaction which manifested itself first in an open manner at meetings on Saturday, August 2d. That the movement toward a strike had taken shape at that time is shown by certain telegrams sent by defendant Suhr, defendant Ford being with him. There were nine of these telegrams, each signed by Suhr, sent through the Western Union office at Wheatland during Sunday, August 3rd, the first, at 5:54 A. M., to T. W. O'Brien, 238 South California Street, Stockton, reading: "Strike on at Durst Bros. Twenty-five hundred out. Send literature at once. Notify Sacramento." He telegraphed "To Secy Local 73, 1117 3rd St., Sacramento Cal. Strike on at Durst twenty-five hundred out. Send books and due stamps and delegate if possible at once." In the afternoon, at 2:40 of the clock, he telegraphed: "To I. W. W. Hall, 3345 17th Street, San Francisco. Strike on in full demands turned down. I. W. W. ordered off the grounds but are here to stay. Send all speakers and wobbles possible. Money needed, lots of families destitute, boycott all employment sharks. Answer." It appeared at the trial that the term "wobbles" meant members of the I. W. W. He sent at the same time a message reading the same as last above "To Secy Ryan, Local 71, I. W. W. Hall, Sacramento"; also one "To Secy B. Sodder, I. W. W. Hall, San Pedro St., Los Angeles"; also one to I. W. W. Hall, 10th Street, Oakland, reading the same; and a similar one to "T. W. O'Brien, 228 So. Cal. St., Stockton"; also to Otto Gantz, I. W. W. Hall, 822 F. Street, Fresno; also one "To San Francisco *Bulletin,* San Francisco. Twenty-five hundred hop-pickers out on strike at Durst Bros ranch. Thirteen hundred to come on Horst Co. ranch to-morrow. Strike conducted by I. W. W. Send reporter to take news."

Much testimony was admitted describing in detail the conditions existing at the Durst hop-fields. We do not think it necessary to set out this testimony. It showed a situation calling for some radical reform measures in order to make it a desirable place for such numbers of people to work, both in respect of their moral and physical well-being. Bad as these conditions were, however, they furnished no justifica-

tion for the tragic events of that Sunday and need not be
dwelt upon. Ford was the leader and spokesman of these
hop-pickers. He conducted their meetings, of which there
were several, during Sunday before the 5 o'clock meeting at
which Manwell was killed. There was a meeting on the pre-
vious Saturday evening, largely attended, as these meetings
generally were, the attendance estimated by some of the wit-
nesses as fifteen hundred or two thousand—"nearly the entire
camp," as one witness expressed it. The usual place of
meeting was a platform slightly elevated from the ground and
situated in the midst of the camp, near to the store, restaurant,
and some places of amusement. These meetings were in the
main orderly but plainly disclosed Ford's mastery and power
to lead and control the more or less excited and turbulent body
of persons comprising a considerable part of the assembled
masses of striking and disappointed people, looking to their
leader for guidance and relief. Suhr's telegrams show that
it was an I. W. W. movement. In the earlier part of the
day Constable Anderson made an effort to arrest Ford, but
being challenged to produce a warrant, and not then being
able to do so, and after some rather rough handling by per-
sons around Ford, he desisted, but later a complaint was sworn
to before a justice of the peace at Wheatland and a warrant
was duly issued thereon and placed in Anderson's hands.
The situation finally became so threatening that Sheriff Voss,
of Yuba County, was sent for. He came to Wheatland and
with him Deputy Sheriffs Reardon and Matthews. At Wheat-
land he was joined by District Attorney Manwell, Constable
Anderson, Henry Daken, and A. W. Armstead, the two latter
deputized as part of the posse. Robert Durst was also with
them. They went to the Durst ranch in two automobiles, ar-
riving together about 5 o'clock Sunday afternoon, driving near
to where a largely attended meeting was in progress. Sheriff
Voss directed Daken, Armstead, and Matthews to remain on
the outside of the crowd. Sheriff Voss, Constable Anderson,
Deputy Reardon, and District Attorney Manwell entered the
crowd and went toward the platform where Ford was stand-
ing and had been speaking. Sheriff Voss's account of what
happened is brief. He testified: "We arrived there at the
hop-yards and I got out of the machine and started toward
the crowd; and I got up close to the crowd and held up my
hand and told them I was sheriff of Yuba County and 'In

the name of the people of the state of California, I demand
you to disperse.' I can't remember the very words that I
used but that is the sum and substance of it; and I hardly
got through talking when I noticed a commotion at one side
and I saw five or six men jumping on Constable Anderson
. . . over there and I hadn't taken but one or two steps when
I was stunned by something hitting me on the head and the
next thing I remember I was turned and facing in the opposite
direction and that is all I know about it." He testified that
up to that time he had not heard any shots fired. He was
asked if he saw anything of the deceased, Mr. Manwell, and
replied: "Yes sir, as I started over there I saw Mr. Man-
well away over there about ten or fifteen feet I judge from
where I was, and he had his hand up in the air. . . . Q. Now,
did you see Mr. Manwell again after you last saw him there, as
I understand you, facing the crowd with his hand up? A.
After I came to I saw him laying on the ground. Q. Was
it near where you saw him with his hands up? A. About
the same place. . . . Q. Did you draw your pistol or revolver
there at that time at all? A. No, sir." He testified that
his revolver was taken from him and it was gone "when he
came to"; that when he started toward Anderson he drew
his policeman's billy but he had no chance to use it and it
was gone also. Constable Anderson is the only other survivor
of the four officers who entered the crowd. Manwell and
Reardon were shot and almost instantly killed. Constable
Anderson testified that after the sheriff had told the crowd to
disperse he observed that "Ford jumped down off the box"
and Anderson stepped into the crowd to find him and "came
right onto him. Q. Let us be particular about that now. A.
He was all kind of crouched up like that (showing), and when
I stepped in there I was surprised to see him so quick . . .
and I said, 'Here, I have got that warrant you were talking
about,' and he backed off and as he backed off he said, 'Hey,
Hey, Hey,' and I said 'none of that,' and reached to grab him,
and as I grabbed hold of him I hollered to the sheriff, I
glanced that way (showing) and said, 'Here, Sheriff, here is
the man we want.' And as I said 'Sheriff,' why, I was hit.
. . . I came to laying on the ground. . . . The next thing I
remember . . . I threw my hand down right quick and as I
did I felt the shock of a shot in my arm here. Q. At
the time you were shot you were on the ground. A. Yes

sir." He was asked how long it was from the time Ford cried "Hey, Hey, Hey" until he was struck. "A. It seemed like the same time that I said 'Sheriff' it seemed the same time I was hit. . . . It would seem from the time that he said 'Hey, Hey, Hey,' it seemed that they all looked around and the crowd milled around me and I grabbed him and I said 'Here, Sheriff, is the man we want' and I was hit, it took just about that long." Deputy Daken was one of the posse left on the outside of the crowd. What he saw from his standpoint he testified to as follows: "I had orders from Mr. Voss to stay on the outside of the crowd, I and Mr. Armstead and a man named Matthews; we stood there as Sheriff Voss and Mr. Durst and Mr. Reardon and Ed. Manwell and Lee Anderson walked into the crowd, and as they walked in Mr. Anderson said to the sheriff, he said—while the sheriff had his hand up he said, 'As sheriff of Yuba County, I demand peace,' and also Mr. Manwell had his hand up and he said, 'Keep the peace, boys, keep the peace,' and about that time Mr. Anderson reached over and said 'Sheriff, here is our man,' and he reached for Ford, and at that time they all commenced to beating with clubs and rocks and beat them down; and when I saw that there was no chance to get in there I said to Mr. Armstead, 'I am going to break this crowd up if I can,' and I fired a shot over their heads and the shooting commenced in general, and I fired the second shot before the crowd opened and when they opened I observed the bodies laying on the ground. Q. How did you fire the second shot? A. Over their heads; and I saw a Porto Rican, he was beating Mr. Voss with a club and I took it to be a police billy; it looked to me like it, and I hollered to him to 'cut it out,' and he kind of looked at me and offered to strike again and I shot him; and at that the crowd kind of surged and were throwing rocks and clubs and hitting me all over and I looked and saw a man come in from behind with a club that I recognized as Nelson afterwards, and yelled to him to stop and he kept coming and I shot; I shot him through the left arm if I remember right, and my shells were exhausted and I made my way for the store. Q. Now, Mr. Daken, you were standing there on the ground and the officers had gone in, can you give me a picture of what happened in there before you fired that first shot over their heads there, tell it in detail. A. My fellow officers were all beaten down before I fired the

shot; that is why I fired it. Q. Who were down? A. They were all down, Mr. Anderson, Mr. Voss, Mr. Manwell,. Mr. Reardon. Q. And up to this time no shots had been fired? A. No sir. Q. Did you see the sheriff fall? A. I did. Q. You have given us the sheriff demanding peace and the district attorney asking for peace. Did the district attorney make any gesture, how was his hand? A. He held his hand up, and if I remember right he had a cigar between those two fingers. (Indicating.) Q. Did you see the defendants, or any of them, at that particular time? A. The only man I saw was Ford; as we drove up he was speaking and he stepped down off the box as the posse walked in. Q. Did you see Ford at the time the sheriff and district attorney, Mr. Manwell, had their hands up asking for peace? A. Yes sir. Q. Where was Ford at that time? A. He had just stepped down off the box.''

A large number of witnesses, both for the prosecution and defense, testified to their recollection of what they saw and heard after the sheriff's posse arrived, and, as is not unusual, there was some conflict in this testimony. It was not clearly or satisfactorily shown who killed Manwell or Reardon or who shot Constable Anderson. Defendant claims that Manwell was shot by a hop-picker known as the Porto Rican with the gun he knocked out of Anderson's hand—a witness so testified. But if such was the fact it does not relieve defendant from his responsibility, for the Porto Rican was one of the confederates, all of whom, who were engaged in the original design, were equally guilty. Many details were brought out corroborative of the testimony given by Voss, Anderson, and Daken and some important facts not seen by either Voss or Anderson, who were down at an early stage of the fray. It is not necessary to go further into this phase of the case. It was clearly shown that the two officers were killed and Sheriff Voss and Constable Anderson beaten down into insensibility, the latter also shot and seriously wounded, by persons in the crowd which Ford had around him, and by persons who, as we think will appear from the testimony, were actuated in so doing by the encouragement given them by Ford and his influence over them. There were, as the testimony showed, fifteen or twenty shots fired—some witnesses said thirty— and it was shown that two of these were by Daken who fired over the heads of the crowd, with the third shot he killed the

Porto Rican and the fourth he fired at one of the crowd who was armed and approaching him, as he thought, in a hostile manner. All the other shots came from Ford's confederates. The important and vital question in dispute is—Does the evidence fix the responsibility for these fatal events, with reasonable certainty, upon Ford? To this question we will next address the inquiry.

At the Saturday night meeting Ford was the speaker. Witness Jameson testified to some of his utterances. Being asked what Ford said, he replied: "As I came up he was talking and he said 'the conditions here are hell' and he said 'if you people want to live in hell you can, but for my part I don't want to live in hell.'" One of the persons present made some protest "and quite a number wanted to make him (the intruder) shut up and Ford said, 'let him alone, it is only disturbing my meeting.' He said, 'There is no use of them sending any tin-horn scissor bill officers after me with stars on them as big as tin cans, they can't get me; if they get me they have got to have guns and they can't get me then.'" The expression, "scissor bill officer" and "scissor bill boss" occurs frequently in Ford's speeches and in responses sometimes by his audience, but no explanation was given of its meaning; that it was an epithet showing hatred is manifest.

Witness Earl Smith was running a restaurant at the camp. The platform where the people mostly assembled was near by. He testified to a meeting at the platform about half past 9 or 10 o'clock Sunday morning at which Ford was the speaker; that he read from a paper or had read the demands of the strikers in various languages; one of the crowd said, "it is better for every one to stand together, stick together"; that later they went to Durst's office. At about half past 1 or 2 o'clock the hop-pickers met again at the platform. At the close of the meeting Ford said: "Before we adjourn our mass meeting I have a few words to say. 'Now,' he said, 'I ask everybody to stand loyal to our demands' and he said, 'If the scissor bill boss don't meet our demands by 10 o'clock tomorrow he will go up in smoke,' and he said, 'Now, it is up to you people whether the scissor bill officers from Wheatland comes out here and arrests me or not,' he said, 'If they do come, I hope you tear them into dog meat,' and the crowd cheered and said, 'Yes, make mince meat out of them,' and he said, 'Now we are going to adjourn our mass meeting;

anybody that wants to know anything or any information about the strike report at the I. W. W.'s.'" This place was a frame building 12x14 called the Bull Pen at the hop-yards and about fifty steps from Smith's restaurant. Smith further testified that Constable Anderson came to his place between 10 and 11 o'clock, from the store, "and there was a large crowd following him and talking and some said, 'hop-head' and 'You big soak' and so on, and I came out of the restaurant before Anderson was at the pumping plant and I said, 'Get in the rig Lee, and I will take you to town, they are liable to murder you. . . . There was a big posse of people after him around the restaurant at that time and Mr. Durst came around the south side of the restaurant and motioned to Lee and said, 'Come on and I will take you to town,' and they got in the machine and started to town and they throwed rocks and said, 'You big hop head' and 'You big soak' and 'we will learn you to come out here and meddle with other people's business, we will teach you.'"

Witness Alvin James was at a meeting in the forenoon of Sunday at which the demands of the hop-pickers were stated by Ford to Durst; that Durst agreed to most of the terms but not all and refused the demand of $1.25 per hundred for picking. The witness testified that when Durst left he heard Ford say that their demands had been refused and continued: "I want all of you that is in any way interested in this now to stand loyal to what I have said and done and we will see that he comes through with these demands." About 12 o'clock the people came together again, the witness said, about fifteen hundred of them, and Ford and some others were appointed a committee to see if Durst would come to their terms and later Ford reported that he had refused "and he told them the only other thing was to see that no other pickers came—to boycott all outside pickers."

Witness Phillips testified that he passed the crowd at a meeting about 11 o'clock and heard Ford say: " 'The officers may get me yet,' he said, 'if they do I don't care a tinker's dam.' He said, 'If you people have any nerve that you will stand by me.'" Witness Howard was present when Constable Anderson came into the camp and heard someone in the crowd say, " 'There is one of the scissor bill s—of—b, now let's get him.'" "I heard Blackie Ford say if we will stay together we will stay on the grounds and that the I. W. W.

had money enough to feed all the hop-pickers and that they would start a free lunch." Witness L. K. Smith testified that he was at a meeting about 1 o'clock and heard Ford addressing the crowd—"something about the scissor bill officers and the scissor bill boss and the constable not to take him. And one of the fellows out in the crowd in reply to that statement, he said that they would mob them if they did. Q. Mob who? A. The boss or the constable." Witness Frank Stineman testified that he was at the meeting about 10 o'clock Sunday and heard what was said to Durst and his reply and was at the meeting when the committee returned from Durst's office. He testified: "About 2 o'clock I heard the crowd yelling and went to see what was going on. The crowd was running around. They seemed to be like a bunch of wild people and Ford was running around with a bunch following behind him . . . and Ford was talking to them all the time telling them to stand loyal and they could not take him." Witness Lewis McCurry testified that he was at one of the meetings about half past 1 or 2 o'clock Sunday. He testified: "I thought I would stop and hear what he (Ford) was going to say and I heard him say 'Let the officers fire the first shot and then they would finish it.'" Deputy Sheriff Daken was at the hop-yard Sunday morning and was at the 10 o'clock meeting at the platform and heard Ford speaking and reading resolutions. He testified: "I heard Ford say at the morning meeting 'don't let them take me.' He was speaking to the crowd in general."

There is much other testimony tending to show that the hop-pickers very generally were wrought up to a high state of excitement and had placed their confidence in Ford to lead them successfully in securing better working conditions and better pay and when they assembled at 5 o'clock in large numbers they were, at least many of them, in such temper that not much was required, as was soon demonstrated, to induce them to resort to acts of criminal violence.

At this 5 o'clock meeting Ford was in charge and was the speaker and leader as he had been throughout the day and it appeared very clearly that the officers were expected any moment. Witness Alvin James was present. Speaking of the coming of the officers he testified: "Just before the automobiles drove up or as they were coming in Ford said, 'Well, boys,' he said, 'the sheriffs are coming and I suppose they will

get me,' and he said, 'I don't care a tinker's dam whether they do or not but if you are loyal to this cause and want to see that this thing is carried through you will stand by me,' and I don't know how many said 'we will knock their dam blocks off if they come in here.' '' Witness R. R. Jameson was present at this meeting and testified: ''Q. Did you hear any statements made by Ford prior to the sheriff's coming up? A. The only statement I heard otherwise than I have said, Blackie Ford said, 'Stand your ground,' or something like that. I couldn't catch all of it but he said, 'Stand your ground' just as the officers were coming up.'' Witness J. J. Hicks testified to what he heard and saw at this meeting. ''Q. Tell us what if anything you heard Ford say? A. The first I heard him say was, they heard they had sent after the sheriff, something to that order and he guessed they would come after him and he said, 'here they come now and it is up to you fellows whether they take me or not,' and some of them said 'they won't take you.' Most of them hollered that and some of them said 'We will cut them into dog meat first.' '' Witness L. K. Smith was present at this meeting. He testified: ''When we got there someone said 'here they come' and Ford held up his hands and talked to the crowd and said he 'hoped they would stand loyal and not let them take him' or words to that effect.'' Witness Chester Cass testified: ''Well, I left Wheatland and got there just about the same time the sheriff landed there; and as I got there some one was speaking up above the crowd; I could see him; I don't know who he was; he had both hands out and said 'stand your ground.' ''

The principles of law already to some extent pointed out, it seems to us, are clearly applicable to the case here presented, and that the jury were fully justified in finding defendant Ford guilty as a principal in the murder of Manwell, although he did not himself fire the fatal shot. The conclusion of the jury that the unwarranted attack upon the sheriff and his assistants while in the execution of a lawful duty, resulting in the death of a deputy sheriff and Manwell, was the direct result of Ford's acts and conduct, was we think, fully justified by the evidence.

4. We are next to notice the evidence so far as it tended to connect defendant Suhr with the killing. We have already given the telegrams sent by him Sunday, August 3rd, showing that he was one of the organizers and conductors of the strike

and boycott. Witness Magruder testified to being present at a meeting of the hop-pickers held about noon of the 3rd of August and heard some talk about Durst not agreeing to the terms demanded. "He said he 'would not give the dollar and a quarter but would agree to everything else'; and they took up a collection to find out to see what they could do to send messages and while I was sitting there a little while afterwards there was a collection, and one man came up, I don't know his name, I didn't know until I came in here—Q. (Int.) Do you know now? A. Yes, I know now, that gentleman there. Q. Which one? A. Suhr—he said 'Blackie, I have thirty-three dollars.' . . . Mr. Suhr came and there was a man who had a shooting gallery opposite me, one of these target shooting games and this man came and said, 'You shut that up, we will not have any target shooting on the ranch, there is a boycott on the ranch.' Q. Who said that? A. Mr. Suhr, and this man that had the gun place, he said, 'I will give you twenty-five per cent of what I take in if you let me shoot this afternoon,' and Mr. Suhr said, 'You don't take me for a twenty-five per cent man, do you? You have got to shut up.' And that evening the shooting gallery moved away and he continued to say everything else would be closed up on the Durst ranch. Q. Who said that? A. Mr. Suhr said that, it looks like the man. Q. In your opinion is this the same man? A. Yes, I believe it to be the same man."

Four witnesses testified to certain admissions or confessions made by Suhr which will next be stated. Witness Francis Heenan, deputy sheriff of Yuba County, testified to a statement made to him by Suhr. The witness had been sent to the Sutter County jail, where Suhr was confined, to bring him to Marysville for the purpose of identifying some one. The statement was made on the way from the court house in Yuba City to the Northern Electric depot, where they got on the cars, some time about the middle of October, 1913. The witness was examined and cross-examined from which it appeared that Suhr had not been asked to make any statement; that no promises or inducements were held out to him or threats or coercion in any manner used and that the statement was "freely and voluntarily made." "Q. What was the statement, tell the jury? A. Well, he first spoke up and said, 'I wish they would take me out and shoot me or give me life imprisonment, I can't stand this thing' and I asked

him what was the matter and what was the trouble, and he said, 'about that shooting down at Wheatland.' Q. Tell it all. A. I asked him what kind of a gun he had and I said, 'there has been a couple of guns missed down there that we never got track of,' and he said, 'a small one' and I asked him what make it was and he said he didn't know and I asked him where he got it and he said he took it out of an old man's hand and that was about the extent of the conversation. . . . Q. Have you given all of the statement to the jury which Mr. Suhr gave you? A. No. Q. Give it all, then. A. Well, since you call my attention there, he spoke about taking a couple of shots at the officers, and I asked him, if I recollect right, if he knew the names of the officers and he said, 'No, they were officers,' or words to that effect. Q. Anything further? A. Yes, I asked him if he hit anybody and he said he 'saw one of them fall—one of the officers fall.' Q. Where were you and Mr. Suhr at the time he made this statement to you? A. Walking from the court house to where we could catch the car, walking along the street.'' On cross-examination he testified that it was half a minute or a couple of minutes' walk to the car from the court house and that they walked along without stopping; that he had no further talk with Suhr on the way over to the court house nor on returning. H. O. Brown, a witness for the defense, testified that he measured the distance from the Sutter County court house ''to the first turn where Heenan and Suhr took the street car'' and found it three hundred and twenty feet.

Witness Bennett Schillig, deputy sheriff of Sutter County, testified to a statement made by Suhr on December 2, 1913, at the time the Ford case was set for trial. The witness was at the time under sheriff and in charge with the sheriff of the jail where Suhr was confined. He testified that no inducement or promise of immunity or reward for making the statement was given him and that ''no coercion or duress or anything of that kind to make him make the statement'' was used. He was asked to give the statement *verbatim* to the best of his recollection. ''A. It was on the evening of the 2nd. Q. Of December? A. Yes, sir, and about between 8 and 9 o'clock; it was about 8 o'clock; it was my custom to go into the jail and lock Mr. Suhr into his cell; when I first went in he complained to me about the postponement of these cases and we had some little talk about that and he asked me my

opinion about it and about the cases and I told him I didn't
know anything about the facts of the matter down there, and
we had some little conversation in regard to Ford. Q. Tell
us all of it as nearly as you can. A. He told me on other
occasions that he was not well acquainted with Ford; in fact
he said, 'We were not good friends while we were at Wheat-
land, not very good friends;' and that night when I was in
there I said, 'Herman, I thought you told me you and Ford
were not very good friends at Wheatland,' and he wanted
to know why and I said, 'I noticed your greetings in the
sheriff's office at Yuba County,' and I said, 'I thought Ford
greeted you like a long lost brother,' and he said, 'Ford is not
a bad fellow,' and he said, 'I used to get sore at him down
there.' Mr. Royce: Never mind what he said about their not
being—Mr. Carlin (Int.): I am not particular about it. Tell
us about the shooting, what he said about it. Mr. Royce: All
right, go ahead. It will all come out anyway. A. I am try-
ing to repeat it as I have it in my mind; you will get me
mixed up. Mr. Royce: It is my fault. A. Anyway in that
remark I mentioned if he thought it was a good idea to be
tried with the other defendants and he said he didn't know,
and I said, 'Perhaps Ford was more guilty than you and it
might have a bad effect on your case.' And he said, 'I am
in worse than Ford,' that 'Ford did not have any gun,' and
I said, 'Did you have one?' and he said, 'Yes,' and I said,
'Herman I don't know what to say about it, I did not know
any facts of the matter.' He said, 'I will tell you,' and he
said, 'When the officers drove up we were there at the plat-
form,' and he said, 'The officers got out and come toward the
platform and the first I knew,—he said, 'There was a man
stepped up on a box or something he thought—it looked to me
as though a man stepped on a box or bench and it broke
down; the man went down and the trouble started' and the
confusion was such that he couldn't tell who any one was;
he didn't know any one there in town, didn't know any of
the officers, but he was trying to get out through the crowd
and as he passed some old man he handed him a pistol and
he said, 'Young fellow, defend yourself.' He took the pistol
and fired it; he didn't know exactly how many times; he said
he might have fired a couple of times, he didn't know; and he
felt a stinging in his arm and he got out of the crowd and
went to some camp; he had been shot in the arm some place;

he didn't know the place but I think it was near the elbow, as near as I recall; but there at the camp some lady bandaged this wound and he started out and went down to the river and when he got to the river he said, 'I thought to myself what am I running away for, I will go back.' And as he started back and had gone a little ways he met Ford and some others. I don't remember now, I have forgotten, but it was either—''

At this point some discussion was had between counsel, after which the witness resumed the narrative: "A. Well, he said he thought, 'I have nothing to run away for, I will go back.' And he met Ford and these other parties. Q. State what he did, not what he said. The Court: If he stated anything further as to what he himself did, state it. A. Then he turned back and caught a freight train that was crossing the bridge and he rode on that freight train to Roseville and from Roseville he got a motor car and went into Sacramento and it was too late to get a train for Stockton and he remained all night in Sacramento and went home the next day to Stockton; and it was either the next day after or the second day, I don't know which, that there was some article come out in the papers in regard to Suhr and Ford wanted for murder and he was somewhat alarmed about it and he left there and went up into Tuolumne County, I believe it was, a timber camp where there was some seventy-five or eighty men working, and he worked in the kitchen as dish washer and waiting on the table; and he worked there about a month and he got to thinking the matter over and he thought he would come back to Marysville and surrender himself, and quit his job; that he told the foreman who he was and why he was quitting; and he got back to Stockton and there he saw some more articles in the papers in regard to the inhuman treatment that the prisoners were receiving in Yuba County; that they were compelled to lie on the floor and their bodies were covered with sores and he changed his mind about coming to Marysville and he concluded that he would go on to Arizona or to Mexico or some place to get out of the way for a while; and he started at that time; I can't remember all the details of his trip down there; he was several days going to Arizona and he was arrested there and brought back. Q. Was there anything by him said about the name he used in camp in Tuolumne County? A. Well, he said that he used

a different name, I can't recall whether it was there at Tuolumne or at Arizona that he used a portion of his own name; he didn't use all of his name; just a portion of it."

Witness Ben Manford testified to a statement made by Suhr on Sunday morning, December 14, 1913. Isaac Smallwood was a deputy sheriff and had charge of the jail at Yuba City and Manford went there to see Smallwood on some business. He had no official connection with the jail but was a constable or marshal. He found Smallwood with Suhr "in a little room in front of the cell" and "wanted to see him to give him a book to collect some taxes." Smallwood was talking to Suhr. "Mr. Carlin: Q. We have already brought you up in your testimony wherein you stated, I believe you said that on the 14th of December of last year Mr. Suhr, the defendant here, made a statement to you in the county jail at Yuba City. Now give the jury all that was said by him and you at that time as near as you can recollect it. A. I walked in the jail that morning hunting for Mr. Smallwood and I said, 'Good morning, gentlemen,' and I said—I see this man in there and I said, 'You just as well be in this morning as out, it is a bad day,' and said, 'Are you from Live Oak?' and he said, 'No,' and Mr. Smallwood said 'That man gave bail and went back,' and said he was in for murder. Q. What man? A. Mr. Suhr. Q. All right, this man said what? A. He said, 'I am held for murder in the Wheatland riot,' and I said, 'How is that, did you just happen to be standing around?' and he said, 'I had been there two or three days waiting for work and for my family,' and he said, 'This riot took place,' and he said, 'some man handed me a gun and I fired two shots at two men, and I turned and walked out. Q. You did? A. Yes, sir, I did, and Mr. Smallwood walked out. Q. Is that all that was said? A. Yes, sir, that is all I heard said."

Smallwood testified: "I am night man over there, deputy sheriff, and by instructions of Sheriff Noyes, to look after things there, and I make it a point to go around once in a while to see that everything is O. K. and that Sunday morning I was there and said good morning to the gentleman. Q. To Mr. Suhr? A. Yes sir, and he said, 'Hello Ike, how are you,' and I said, 'Pretty fair,' and by that time Mr. Manford came in. Q. And before Mr. Manford's arrival you and the defendant Suhr—had you and the defendant Suhr had any con-

versation or talk at all concerning the subject matter, concerning the statement he made to Mr. Manford? A. No, sir, none whatever. Q. Had he and you been talking in any way at all about the case that he was in jail on—on the charge? A. No sir. Q. In no way? A. In no way. Q. Did you hold out to him there at that time, hold out to the defendant Suhr any promise of reward or inducement to cause him to make a statement? A. I never did. Q. Did you ask him to make a statement? A. I never did. Q. Did you exercise or was there exercised at any time in your presence any coercion or duress to cause the defendant to make a statement? A. Never did. Q. Did anybody else in your presence? A. No sir. Q. Did Mr. Manford hold out any hope of reward or promise or use any duress? A. No sir. . . . Q. Now, did the defendant Suhr at that time and place, in the presence of yourself and Mr. Manford, make a statement concerning his complicity in the Wheatland shooting which resulted in the death of Mr. E. T. Manwell, tell the jury what the statement was. Mr. Royce: State the whole conversation. Mr. Carlin: Yes, sir. The Witness: Word for word? Mr. Carlin: Yes sir. A. I can't, word for word. Q. As near as you can. The Court: Give your best recollection. A. The best recollection was when Mr. Manford came back he said 'Good morning, Ike,' and I said, 'Hello, Ben,' and he stepped up and looked around and said, 'Good morning' to Mr. Suhr and he said 'Are you here yet?' and he said, 'Yes, I am here,' and the conversation led on and he said, 'Yes, I am in here regarding the Wheatland riot,' and he said, 'I didn't know that,' that is what I understood Mr. Manford to say. Then I understood Mr. Manford to say, 'Is that so,' and he said, 'Yes,' that is as near as I can remember it, and I understood him to say—Mr. Royce: (Int.) We will object to what you understood him to say. The Court: Your best recollection. A. In my best recollection Mr. Suhr said, 'I grabbed the gun and fired,' and I understood him to say he grabbed it from an old man, and then there was another word or two passed, I didn't catch it, and I said, 'Ben, I have got to be going,' and he said, 'All right.' That was the marshal. And that is about all that I heard. Q. Was there anything said there about shooting at anybody? A. I heard him say he fired. . . . Q. Have you stated all that you remember? A. All that

I remember outside of Mr. Suhr speaking to the marshal that he was expecting his family there.''

Suhr testified in his own behalf. As to the conversation with witness Heenan he testified that he had none that he can remember. His testimony as to the statement made to witnesses Smallwood and Manford was: ''Well, Mr. Smallwood came in there and talked to me and we were talking about the weather, and another fellow came in there and said, 'good morning' (presumably Manford), he said, 'you are better off inside than out,' and I said, 'I am not,' and he said, 'What are you in here for?' and I said, 'on account of the Wheatland trouble,' and he said, 'Did you have any gun and did you do any shooting?' and I said, 'I didn't and that was all that was said and they walked out. Of his conversation with witness Schillig he testified as follows: ''When we left the court house I said to Mr. Schillig that I was going to buy a piece of tobacco and I went to the store and bought a piece of tobacco and I wanted to go across the street where the car stopped and he said 'Oh, come on, I am dry' and he went to the saloon and bought a bottle of beer for himself and he give me a glass of beer and he said one wasn't enough and he took another bottle and give me a glass and then we went out and stood on the corner and he let the car pass, and he said 'There goes the car' and I said 'We better walk than standing here' and he started off and left me standing there and I followed him off until we got across the street. He was about five yards ahead of me and I saw Mr. Stanwood there talking to two fellows and Mr. Stanwood looked at me as though he was going to grab hold of me and he didn't. And then we walked past the park and Mr. Schillig got into an automobile and I stood on the hind axle and held on with one hand until we got into Yuba City and he locked me up and he went over and got my supper and then he went to the post-office and came back and asked me what they made out to-day and I said that we were all going to be tried in one case, and he got mad at my attorneys and said he was going to slap them in the face if they came in there again. Q. Did he mention their names? A. Yes sir, Royce and Downing and started in cursing about a fellow named 'Burton' and then he said to me 'They haven't got any case against you and what do you want to be tried with those fellows for,' and I said 'I didn't think that they have any case against Ford, I didn't

25 Cal. App.—27

see him doing anything,' and that is practically all that was said.''

The foregoing is substantially Suhr's entire testimony, except as to his personal history up to the time he came to Wheatland, which showed that he had a wife and children and had pursued farming and various other honorable occupations.

A distinction exists, in legal contemplation, between admissions and confessions, as pointed out in *People* v. *Miller*, 122 Cal. 84, 87, [54 Pac. 523]. In *People* v. *Strong*, 30 Cal. 151, it was said: ''A confession in criminal law is the voluntary declaration made by a person who has committed a crime or misdemeanor, to another, of the agency or participation he had in the same. The word 'confession' is not the mere equivalent of the words 'statements' or 'declarations.' The term 'confession' is restricted to acknowledgment of guilt. (1 Greenleaf on Evidence, 170.) '' ''An admission of a fact, not in itself involving criminal intent, is not to be rejected as evidence (without preliminary proof) merely because it may, when considered with other facts, tend to establish guilt.'' (*People* v. *Parton*, 49 Cal. 632, 638. See, also *People* v. *Le Roy*, 65 Cal. 613, [4 Pac. 649]. It was held, in *People* v. *Knowlton*, 122 Cal. 357, [55 Pac. 141], that declarations of the accused which are not confessions of guilt cannot be objected to as obtained under duress. (*People* v. *Ammerman*, 118 Cal. 23, [50 Pac. 15].)

It is perhaps not necessary to make any distinction between the different statements of Suhr testified to, for in each instance full preliminary proof was made of their voluntary character.

While the rule is that confessions are to be received with great caution (*People* v. *Gilbert*, 39 Cal. 664; 1 Greenleaf on Evidence, sec. 200) Mr. Greenleaf says: ''When the admission is deliberately made and precisely identified the evidence it affords is of the most satisfactory nature.'' Speaking further on the subject and after stating certain cautions to be observed, he says: ''Subject to these cautions, in receiving and weighing them it is generally agreed that deliberate confessions of guilt are among the most effectual proofs in the law. Their value depends on the supposition that they are deliberate and voluntary, and on the presumption that a rational being will not make admissions prejudicial to his

interest and safety, unless when urged by the promptings of truth and conscience. Such confessions so made by a prisoner, to any person, at any moment of time, and at any place, subsequent to the perpetration of the crime, and previous to his examination before the magistrate, are at common law received in evidence as among proofs of guilt.'' (Id., sec. 215.)

Admissions and confessions of a defendant which appear to have been voluntarily made may properly be received in evidence (*People* v. *Goldenson,* 76 Cal. 328, [19 Pac. 161] ; *People* v. *Fredericks,* 106 Cal. 554, [39 Pac. 944]) ; they are substantial evidence of guilt (*People* v. *Chrisman,* 135 Cal. 282, 286, [67 Pac. 136]) ; and it seems to be well settled that where the *corpus delicti* is otherwise satisfactorily proven a defendant may be convicted on his uncorroborated confession. (*Andrews* v. *People,* 117 Ill. 201, [7 N. E. 265] ; *Bartley* v. *People,* 156 Ill. 234, [40 N. E. 831] ; *Wimberly* v. *State,* 105 Ga. 188, [31 S. E. 162] ; *Mitchell* v. *State,* 45 Fla. 76, [33 South. 1009] ; *Dugan* v. *Commonwealth,* 102 Ky. 251 [43 S. W. 418] ; *Sullivan* v. *State,* 58 Neb. 799, [79 N. W. 721].) Where there is clear and positive proof of the *corpus delicti,* the court said, in *Wimberly* v. *State:* ''It has been too often ruled to be now gainsaid, that such proof of the *corpus delicti* may be considered as a circumstance sufficiently corroborating a confession.'' Nor is it necessary that proof of the *corpus delicti* connect him with the commission of the crime, to authorize proof of admissions. (*People* v. *Tarbox,* 115 Cal. 57, [46 Pac. 896].)

It may be conceded that Suhr's telegrams, sent on August 3d, early in the morning and in the afternoon of that day, go no further than to show his activities in the strike and boycott and alone would not justify an inference of complicity in the conspiracy formed later in the day; and the same may be said of his connection with the meeting at which a collection was taken up. That he was, however, one of the prominent and influential spirits in keeping alive the feeling which finally culminated in a tragedy is fairly inferable from all the evidence, although we do not think that this alone would warrant an inference that he at any time prior to the 5 o'clock meeting contemplated forcible resistance to the officers or any open violation of law, as was the case with Ford. The proof of the commission of the crime was fully

established independently of any admissions or confessions of Suhr. These admissions and confessions, then, must be given whatever weight the law authorizes. There was in them sufficient to make him directly responsible for the death of Manwell, under the principles of law which we have applied to Ford's case, although he may not himself have killed Manwell. We cannot say that on the face of these confessions they appear to be unbelievable or inherently improbable. They were testified to by witnesses who stand unimpeached and whose official position would seem to carry with it some evidence of their character for truth and honesty. It may seem improbable that Suhr would have "given himself away" at a time when his counsel were preparing his defense, as is strongly urged. But is it less improbable that the witnesses to his confession committed perjury? However, the sole responsibility for accepting the testimony of these witnesses as true and making their own deductions from it was with the jury and with its conclusions the constitution of the state prevents our interfering.

5. Some alleged errors in giving and refusing instructions, not hereinbefore considered, and in rulings upon testimony offered will be briefly noticed.

It is claimed that defendants' requested instruction numbered 3, upon the question of reasonable doubt, was that given in the case of *Commonwealth* v. *Webster,* 5 Cush. (Mass.) 320, [52 Am. Dec. 711], and should have been given and was not in effect given by instruction 28. The criticism arises out of some expressions in the instruction given in addition to the form so often approved, and the safest to be used on the subject, as given by Chief Justice Shaw. For example, it reads in part: "The term 'reasonable doubt,' as referred to in these instructions is a term often used, probably pretty well understood, but not easily defined," etc. In its concluding paragraph the court said: "A doubt that will justify an acquittal must not only be a reasonable one, but must arise from a candid and impartial examination of all the evidence in the case, or from a want of sufficient evidence on the part of the prosecution to convince you of the truth of the charge." The suggestion to the jury that the term "reasonable doubt" is "pretty well understood, but not easily defined," was unnecessary but harmless. The other criticised language, it is claimed, "eliminates the plain mandate of the

law that the jury must be convinced beyond a reasonable doubt of the guilt of the accused.'' The jury were so plainly told that they could not convict unless the evidence convinced them beyond a reasonable doubt, and this admonition occurs so frequently in the instructions, that we cannot believe there was prejudicial error in not repeating it at the end of this paragraph.

6. The refusal to give defendant's instruction 21 was justified. It relates to the testimony of witnesses who may have had an interest in the result and states: "you have a right to disregard entirely the testimony of any witness whom you believe to have willfully testified falsely." The instruction fails to use the necessary qualifying words "in a material matter." Otherwise, the instruction would be misleading and not a correct statement of the law. Besides, the court instructed the jury that "a witness willfully false in one part of his testimony is to be distrusted in others."

7. The record is singularly free from alleged errors in rulings upon testimony admitted and refused. We feel justified in remarking that the learned trial judge showed a degree of patience and judicial equipoise and fairness not always found in hotly contested criminal trials lasting many days, as this did. But two assignments have been called to our attention and these are of little importance. One of defendant's witnesses was asked, on cross-examination, if he had ever attended any of the meetings of the I. W. W. and defendant's objection was overruled. A witness for the defense was asked, on his direct examination—"Did you ever hear any threats made there at that meeting Saturday evening?" Objection was sustained. He was then asked: "What if anything did you hear at that meeting?" and answered fully. We discover no error in these rulings.

The judgment and order are affirmed.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on November 9, 1914.