No. 2416.

J. L. BOWERS *v.* THE STATE.

1. MAIMING.—To constitute the offense of maiming, the act must be done both willfully and maliciously.
2. SAME—TERMS DEFINED—CHARGE OF THE COURT.—A *willful* act is one committed with an evil intent, with legal malice, without reasonable ground for believing the act to be lawful, and without legal justification. A *malicious* act is one committed in a state of mind which shows a heart regardless of social duty, and fatally bent on mischief; a wrongful act, intentionally done without legal justification or excuse. In all trials for maiming, the legal signification of the terms "willfully" and "maliciously" must be explained to the jury by the charge of the court.

3. SAME—EVIDENCE—INTENT.—See the statement of the case for evidence which, tending to show that the act of the accused was neither willfully nor maliciously done, within the legal signification of those terms, was erroneously excluded by the trial court, such evidence being competent upon the question of intent.

4. SAME—PRACTICE—CONSPIRACY.—The general rule obtains in this State that each conspirator is responsible for everything done by his confederates which follows immediately in the execution of the common design, as one of its probable and natural consequences, even though it was not intended as a part of the original design or common plan. In other words, the act must be the ordinary and probable effect of the wrongful act specifically agreed upon, so that the connection between them may be reasonably apparent, and must not be a fresh and independent product of the mind of one of the confederates, outside of, or foreign to, the common design. Whether or not the act was the ordinary and probable effect of the common design or conspiracy, or whether it was a fresh and independent product of the mind of one of the conspirators, outside of, or foreign to, the common design, are questions which, under proper instructions, should be submitted to the jury for solution. See the opinion for a state of case to which the rule applies.

5. SAME.—Biting off *a portion* of a member of a person's body does not necessarily constitute maiming. In all such cases the jury should be left, under proper instructions, to determine whether or not the injury was such as substantially to deprive the injured party of the member.

APPEAL from the District Court of Falls. Tried below before the Hon. Eugene Williams.

The conviction in this case was for maiming one H. A. Dansby, by biting off a portion of his thumb, and the penalty assessed against the appellant was a term of two years in the penitentiary.

H. A. Dansby was the first witness for the State. He testified, in substance, that for some time prior to July 4, 1887, he, the witness, the defendant, one T. J. Estes and one R. W. Ledbetter were confined together as prisoners in the same apartment, up stairs, in the jail of Falls county, Texas, at Marlin. A short while before the said July 4, their number was increased by the confinement in the same apartment of Giles Cheek, E. G. Moody and Ed Foster. On or about June 29, 1887, a negro confined in jail became obstinate and insubordinate and resisted the control of the jailer. When the sheriff attempted to place the said negro in restraint, he resisted and was shot and killed by the sheriff inside the jail. When the inquest over the dead body of the negro was held, on the morning of July 4, the witness was placed

upon the stand and testified to the circumstances attending the killing of the negro as they appeared to him. After the inquest the witness was turned into the "run around" or corridor of the jail to converse with his wife, who called to see him. He was returned to the cell about midday. At about that time Lee Estes, a brother to T. J. Estes, came to the jail and had a private talk with T. J. Estes. Soon after Lee Estes left, the defendant, in the presence of T. J. Estes and the other white prisoners, told witness that he was to be tried after dinner. Witness asked what he was to be tried for. Defendant replied that witness would be told in good time. Estes then said that his brother Lee, while at the jail on that morning, told him that witness testified upon the inquest upon the body of the negro that he, T. J. Estes, told the negro who was killed to fight and resist the jailer with a certain lock and chain that lay near the cell door, and that defendant furnished the negro with a knife for the purpose of resisting the jailer, all of which he said was a d—d lie told by witness. He said further that witness was going to be tried for swearing to those lies. Witness went into Ledbetter's cell with Ledbetter, after dinner, and the other prisoners went into the adjoining cell. While in Ledbetter's cell witness heard the prisoners in the other cell talking. He could not hear what they said, but heard them mention his name repeatedly. Soon after this the witness went into the corridor and took a seat not far from Ledbetter's cell. Estes, Foster and defendant then came out of the other cell, and took, respectively, the positions shown in the following diagram:

| Ledbetter's cell. | Moody's cell. |
|---|---|
| O Estes. | O Foster. |
| | Corridor. |
| O Dansby. | O Bowers. |

They then began to talk to witness about his testimony on the inquest over the body of the negro. Witness got up to go back into Ledbetter's cell, when Estes caught him about the arms. Witness squatted to break Estes's hold, when defendant

rushed up and caught him. While witness was struggling to free himself from the clutches of defendant and Estes, defendant called to Foster: "If you are going to do what you agreed to do, come on." Foster then ran up and caught witness by one leg. The parties then threw witness to the floor in Ledbetter's cell. His head struck the floor violently. Estes then got across witness's breast, defendant across his loins, and Foster across his legs. Witness then got one of his hands in Estes's collar, but Estes got it loose and placed witness's thumb in his mouth and proceeded to bite it. While Estes was thus biting it, defendant kicked witness's arm. The kick released the witness's thumb from Estes's mouth. Estes then choked witness into insensibility. The witness did not know how long he was insensible, but when he came to himself he found Jailer Norwood, armed with a pistol, standing in the cell. Witness then got up and found a piece of his thumb, which had been torn from the end of that member, lying on the floor. He picked it up, placed it in his pocket, and afterward gave it to Mr. Norwood. The piece mentioned was torn diagonally from across the thumb, and included about two-thirds of the nail. Doctor Rice dressed the witness's thumb on the same day. Defendant beat the witness in the face before his thumb was bitten off. Estes and defendant had been unfriendly toward the witness for some time before this.

R. W. Ledbetter, for the State, testified to the material facts substantially as did the witness Dansby, except that, according to this witness, Dansby was not thrown violently to the floor by defendant and Estes, but, on the contrary, was very gently laid out by them, and his head could not have been hurt or injured by contact with the floor. Dansby was once released by Estes and defendant, but he, Dansby, rushed upon Estes and the fight was renewed. When the fight first began witness began calling for Deputy Sheriff Norwood, and continued to call until he came. At that time Estes had Dansby bent about half over and was on him. Dansby may have then been holding Estes, but witness could not so say. After the fight was over, witness observed that part of Dansby's thumb was gone, and his hand was bleeding. When jailer Norwood came to the scene of the fight, and saw Estes on Dansby's back, he placed his pistol to Estes's side and told him to release Dansby on pain of being shot, and Estes obeyed. The jailer then confined Estes, defendant and Foster in a cell and locked them in. The witness, long prior to this occur-

rence, knew of the bad feeling existing between Dansby, Estes and defendant, and once requested the jailer to confine Dansby and Estes and defendant in seperate cells. Witness had heard Estes and defendant accusing Dansby of swearing falsely about them on the inquest over the body of the negro killed in the jail, and had been fearful, from their talk, that they intended to hurt Dansby. If Dansby became unconscious while he was choked by Estes, witness did not know it, and did not think, from the character of his movements shortly after the choking, that he did. His face, however, became purple, and was badly scratched.

Deputy Sheriff C. A. Norwood was the next witness for the State. He testified, in substance, that he was the jailer in charge of the Falls county jail at Marlin. On the day alleged in the indictment, the witness, being at Judge Wharton's office on the south side of the square, about one hundred and fifty yards from the jail, heard the disturbance at the jail. He ran immediately to the jail, and found Dansby near the cells, on the inside, lying on his back. The defendant was sitting on Dansby's stomach, striking him in the face, and Estes was at his head, choking him. Foster appeared to be walking around the parties, and old man Ledbetter following him to prevent him from striking Dansby. Witness several times ordered the parties to desist. As they paid no attention to him, he ran to his room and secured his pistol. Returning, he thrust his pistol through the bars, and against Estes's side, and told Estes that he would kill him if he did not release Dansby, whom he was then holding half bent and choking. The defendant was then standing near. Estes called to witness not to shoot; and released Dansby. Witness then ordered defendant into one of the cells, and afterwards placed Foster in, and locked them in. Witness then observed that Dansby's hand was bleeding, and asked him if his finger had been bitten off. He replied in the affirmative, and took from his pocket, and exhibited to witness, a fragment of his thumb, which witness afterwards gave to Doctor Rice. Witness knew that the feeling of defendant and Estes for Dansby was not friendly. He knew that fact by the character of talk he overheard among the several prisoners. He heard defendant, on one occasion, say that Dansby would swear to any d—d lie in the interest of the sheriff. About two-thirds of the nail, and a somewhat larger piece of flesh was bitten from the ball of Dansby's thumb.

Doctor S. P. Rice testified, for the State, that he dressed Dans-

by's thumb after it was bitten. A part of the ball of the thumb and about two-thirds of the nail were bitten off. A small part of the soft bone at the end of the thumb was also bitten off. The thumb would be tender, troublesome and sore for a year or more; would always be stumpy, and the nail would grow hooked over the end of it, but it would eventually be a fair thumb.

The State closed.

Ed Foster was the first witness for the defense. He testified that he was confined in the Falls county jail with defendant, Estes and Dansby, at the time of the difficulty, the particulars and details of which, together with its results, he related as did Dansby and Norwood. The witness stated further that he knew that Estes and defendant were angry with Dansby because of his testimony upon the inquest over the body of the negro killed in jail by the sheriff. They often talked to witness about Dansby and his said testimony. Lee Estes, a brother of the prisoner Estes, visited the jail on the morning of July 4, 1887, and had a long conversation with his brother. After he left, Estes and defendant discussed Dansby and his evidence before the inquest, and asked witness to help them "strap" Dansby for what he had sworn to. Witness first declined to help them, but finally agreed to help them whip Dansby if they would solemnly agree not to do Dansby any injury. It was then agreed that defendant and Estes were to undertake to whip Dansby, and witness was to help only in the event he was called upon, and upon condition that Dansby was not to be injured. In pursuance of this agreement, defendant and Estes caught Dansby, and defendant called upon witness to help. Witness caught Dansby's legs and helped throw him to the ground. Estes then proceeded to choke Dansby, and defendant to beat him in the face. Estes got Dansby's thumb in his mouth, when defendant kicked Dansby's arm, with the result stated by the previous witnesses. Witness knew that Dansby's thumb was not mashed off by having the cell door closed upon it, but it was a fact that, after being locked up together after the fight, defendant, Estes and witness agreed to say and to maintain that Dansby's finger was mashed off by the door closing upon it. During that time, witness heard Estes say that he had bitten off Dansby's d—d old finger. Witness had been indicted, tried and acquitted of this same offense. Restating the circumstances of the fight substantially as they were related by the witness Dansby, this witness stated that when Dansby was released by Estes and defendant, after his thumb was

kicked out of Estes's mouth, Dansby rushed upon Estes, and defendant joined the fight in the interest of Estes. Witness then interfered to prevent further fighting, saying to defendant: "I thought we were not to hurt him. If you are going to turn it into a fight, but one of you shall fight him." It was about this time that jailor Norwood appeared with his pistol, compelled the release of Dansby, and locked witness, Estes and defendant in one of the cells. The cell door was constructed of heavy iron which closely fitted into the door facing, and was very sharp at the edge. If it should catch a man's finger in closing violently, it would undoubtedly cut it off. When near that door, however, Dansby lay across it, with his shoulder on the threshold.

On his cross examination the witness stated that, judging from what he had heard defendant and Estes say of Dansby, their feeling towards Dansby was very bitter. After Lee Estes's visit to the jail, the witness heard the prisoner Estes say that his brother Lee told him that, on the inquest over the negro's body, Dansby swore that he, the prisoner Estes, told the negro to use a certain lock and chain to resist the sheriff, and that defendant dropped a knife into the negro's cell, to be used for like purpose by the negro, all of which, he said, was a d—d lie. Witness was certain that the door had nothing to do with the maiming of Dansby's thumb. Witness agreed to help Estes and defendant strap Dansby with a leather strap, only upon condition that Dansby was not to be hurt. At this point the counsel for the defense asked the witness if "prisoners have laws in jail?" This question being objected to by the State, the defendant's counsel asked the witness if there was any understanding on the part of Dansby by which he agreed to this whipping. Witness answered that Dansby was not a party to the agreement.

The excluded evidence referred to in the third head note of this report was that proposed to be elicited from the witnesses Ledbetter and Foster, to the effect that the prisoners confined in the Falls county jail at the time of this alleged offense had a code of written laws, adopted by themselves, and posted in the cells. Under that code certain penalties were prescribed for certain offenses. Lying was one of the offenses denounced by that code, and the penalty prescribed therefor was whipping with a certain leather strap or boot leg. Dansby was familiar with those laws, participated in their adoption, and had frequently

participated in the enforcement of the same upon other pris-
oners.

The motion for a new trial raised the questions discussed in
the opinion.

*P. P. Norwood,* for the appellant.

*W. L. Davidson,* Assistant Attorney General, for the State.

WILLSON, JUDGE.    To constitute the offense of maiming, the
act must be done both *willfully* and *maliciously.* A *willful* act is
one committed with an evil intent, with legal malice, without
reasonable ground for believing the act to be lawful, and with-
out legal justification.    A *malicious* act is one committed in a
state of mind which shows a heart regardless of social duty and
fatally bent on mischief; a wrongful act intentionally done with-
out legal justification or excuse.

In trials for this offense the legal signification of the words
"willfully" and "maliciously," must be explained to the jury.
(Willson's Texas Crim. Laws, secs. 876 and 877.) This, we
think, was substantially and sufficiently done in this case.    But
we are of the opinion that the court committed a material error
in rejecting the testimony of the witnesses Ledbetter and Foster,
offered by the defendant for the purpose of showing, or as tend-
ing to show, that the violence inflicted upon the injured party
was not inflicted willfully and maliciously, within the legal sig-
nification of those terms.    We think the rejected testimony was
pertinent to the issue of intent, and that the defendant was
entitled to have it placed before the jury for their consideration,
in connection with the other evidence adduced.

It is insisted by counsel for the defendant that the law applica-
ble to the facts of this case was not given in charge to the jury.
It appears from the evidence that the defendant, one Estes,
Dansby, the injured party, and others were confined as prison-
ers in the county jail.    Dansby had testified as a witness at an
inquest held over the dead body of a negro prisoner who had
been killed in said jail a short time before the difficulty occurred
which is the foundation of this prosecution.    Defendant and
Estes charged that he had given false testimony before said
inquest, and they and others of the prisoners agreed that for so
falsely testifying they would whip Dansby with a leather strap,
an instrument which they had in jail.    In pursuance of this

agreement they assaulted Dansby, who resisted them. Estes, assisted by the defendant and others, threw Dansby upon the floor. Estes and Dansby were fighting each other, and during the fight, while the parties were down on the floor, Dansby was deprived of a portion of one of his thumbs.

It is clear from the evidence, we think, that the injury to Dansby's thumb was caused by the teeth of Estes. Estes seized Dansby's thumb with his teeth, and the defendant kicked Dansby on the arm, thus extricating Dansby's thumb from Estes's teeth. It is not clear from the evidence what motive actuated the defendant in kicking Dansby on the arm; whether his purpose was to aid Estes in the struggle, or to release Dansby's thumb from Estes's teeth. But we will not pause to consider or discuss this feature of the case.

The important and controlling question presented by the facts is, whether or not the defendant is criminally responsible for the act of Estes in biting Dansby's thumb. It is made clear by the evidence that defendant, Estes and others had entered into a conspiracy to whip Dansby with the leather strap. Does the fact that defendant had entered into, and engaged in the execution of, such a conspiracy render him liable with Estes for biting Dansby's thumb?

Upon the subject of the responsibility of a conspirator for the acts of his co-conspirators, the rule, as we deduct from the authorities, is that each conspirator is responsible for everything done by his confederates which follows incidentally in the execution of the common design, as one of its probable and natural consequences, even though it was not intended as a part of the original design or common plan. In other words, the act must be the ordinary and probable effect of the wrongful act specifically agreed on, so that the connection between them may be reasonably apparent, and not a fresh and independent product of the mind of one of the confederates outside of or foreign to the common design. (1 Whart. Crim. Law, 9 ed., secs. 214-220, 397; 1 Bish. Crim. Law, 7 ed., secs. 640, 641; Lamb v. The People, 96 Ill., 73; Ruloff v. The People, 45 N. Y., 23; Thompson v. The State, 25 Ala., 41; Frank v. The State, 27 Ala., 37; Williams v. The State, 9 Crim. Law Mag., 480; Kirby v. The State, 23 Texas Ct. App., 13.) The last cited case is not in conflict with the rule as above stated, but is in perfect harmony with it when viewed with reference to the facts before the court.

Now, the rule being as we have stated it to be, the responsi-

bility of the defendant for the said act of Estes depends upon the solution of another question; that is, was the act of Estes in biting Dansby's thumb the ordinary and probable effect of the wrongful act of attempting to whip Dansby with a leather strap, or was it a fresh and independent product of the mind of Estes, outside of or foreign to the common design? If the former, the defendant is responsible for the act; but if the latter, he is not responsible for it. How must this question be solved? By the jury alone. It is a question of fact, and within the exclusive province of the jury.

In the recent and celebrated case of Spies v. The People, N. E. Reporter, page 865, the court said: "Whether or not the act done by a member of a conspiracy naturally flowed from and was done in furtherance of the common design are questions of fact for the jury." We are of the opinion that the court erred in not submitting the question above stated to the jury, accompanied by proper instructions explaining the rules of the law hereinbefore announced. This phase of the case as made by the evidence was not covered by the charge. Defendant's counsel requested a special charge relating to it, which, although not full and accurate, was sufficient to direct the attention of the court specially to the issue.

Another issue which should have been submitted to the jury is, whether the injury inflicted on Dansby's thumb constituted maiming. Biting off a portion of a member of the body is not necessarily maiming. It should be left to the jury to determine in all such cases whether the member was so injured as to substantially deprive the injured party of it. (Willson's Texas Crim. Laws, sec. 877.) This issue the court failed to submit to the jury, and in so failing did not give the jury the whole law applicable to the evidence.

Because of the errors mentioned, the judgment is reversed and the cause is remanded for a new trial.

*Reversed and remanded.*