[Crim. No. 1947. First Appellate District, Division One.—December 28, 1938.]

THE PEOPLE, Respondent, v. EARL KING et al., Defendants.

Leo Friedman, George R. Andersen, Aubrey Grossman, Herbert Resner, George Olshausen, Myron Harris, William H. Older and John B. Ehlen for Appellants.

U. S. Webb, Attorney-General, Seibert L. Sefton and William F. Cleary, Deputies Attorney-General, Earl Warren, District Attorney, Ralph Hoyt, Chief Assistant District At-

torney, Charles Wehr, Assistant District Attorney, and Nathan Harry Miller and Cecil Mosbacher, Deputies District Attorney, for Respondents.

THE COURT.—The appellants herein, namely Earl King, E. G. Ramsay and Frank Conner, were, with one George Wallace and one Ben Sakovitz, indicted by the grand jury of Alameda County as principals for the murder of George W. Alberts. Sakovitz has never been apprehended. King, Ramsay, Conner and Wallace were tried before a jury and all four were found guilty of murder in the second degree. The defendant Wallace has not appealed, but King, Ramsay and Conner have each appealed from the individual judgments of conviction and from the orders denying each a new trial.

George W. Alberts was chief engineer on the steamer Point Lobos. He was killed in his stateroom on Sunday morning, March 22, 1936. At the time of his death he was about thirty-seven years of age, in excellent physical condition, and stood about six feet in height and weighed around two hundred pounds. A crushing blow with a dull instrument of some kind was dealt him in the middle of the back of the head, which blow did not cut, but battered the flesh from the skull. Likewise severe blows were dealt him on each side of the head above and behind the ear. According to the testimony of the autopsy surgeon, any one of the three blows on the head would have rendered Alberts unconscious, and in all probability that on the back of the head was fatal. In addition he was stabbed in the chest and shoulders, and a knife had been thrust into his abdomen, through both walls of the stomach and into the pancreas; and a cut nine and one-half inches long was made on the back of the left thigh to the bone, which severed both the large artery and vein of the left leg.

Alberts entered his stateroom at about 11:00 o'clock on Sunday morning, having come aboard ship with the captain. At about 11:20 the ship's first engineer opened the door of Alberts' stateroom to call him and found him dead. The killing had been accomplished and the escape of the assailants from the scene of the crime had been effected in about fifteen minutes.

At the time of the killing the three appellants here were connected with the Marine Firemen, Oilers, Watertenders and Wipers Union. King was the secretary and chief executive officer of the union; Ramsay was a patrolman of the union; and Conner, an oiler on the Point Lobos, was the union's delegate on the ship. The defendants Wallace and Sakovitz were also active members of the same union. All of the defendants, except Sakovitz, were arrested about five months after the killing. Conner was taken into custody in Seattle, Washington, and shortly afterwards made a confession which later he attempted to repudiate. Wallace was arrested in Brownsville, Texas. He also confessed, and at the trial became a witness in his own behalf. Much of the evidence establishing the case of the prosecution consisted of the testimony given by Wallace, the testimony introduced in corroboration thereof, and Conner's confession. The remainder of the evidence upon which the convictions were based included independent facts and circumstances which it was claimed tended to establish guilt. From all of the evidence so offered and received, the following facts appear: On Saturday morning, March 21, 1936, Conner telephoned King at the office of the union in San Francisco, telling him that Alberts had discharged one Edward Widmer, a member of the engineroom crew and a member of the union, without paying him all of his overtime money due and asking King for a patrolman to come over and get the matter fixed up. The defendant Wallace was at the union headquarters at about the time Conner telephoned to King. King met Wallace and asked him if he wanted to go on a job, to which Wallace replied that he did not, and walked away. Ramsay and Sakovitz met Wallace shortly thereafter and told him that he had better come back to King's office; that King wanted to see him. The three, Wallace, Ramsay and Sakovitz, then entered King's private office, where Ramsay stated: ''That God damn fink, he belongs to some company union and he needs a lesson.'' To which King added: ''Go over and beat him up.'' It appears that in addition to this there was further discussion among those assembled, both prior and subsequent to King's instruction to go over and beat him up. King went to the outer office of the union where A. M. Murphy, assistant secretary and treasurer of the union had his desk. Here, he directed

Murphy to give Ramsay $30, which Murphy did. Upon being asked by Murphy for what purpose the union funds were being given to Ramsay, King replied that the money was to be used for an "expedition across the bay", that he did not know how much Ramsay would need but he wanted him to have enough so he would not run short.

Wallace and Sakovitz proceeded to the street in front of the union headquarters. Here, Sakovitz asked Wallace if he had anything on him as they expected trouble over there. Wallace replied that he did not, and Sakovitz suggested that he go see the janitor, which he did. While Wallace was waiting at the supply room of the union hall, King passed him and told him not to say anything to the janitor about the matter. The janitor gave Wallace a piece of rubber, described as being one-half of a printing roller about eighteen inches to two feet long and about four or five inches in thickness. This bludgeon was given by Wallace to Sakovitz. Ramsay, Wallace, Sakovitz and a sailor whose name is not known, then proceeded to the Howard Terminal in Oakland where the Point Lobos was docked. They arrived on the dock at about noon and remained there until about four o'clock in the afternoon. During this time Ramsay twice left the group and boarded the Point Lobos. Upon his first return he remarked: "That God-damned fink, I talked to him and I could not get him off." Conner then joined the group on the dock. Ramsay boarded the ship a second time, and upon leaving said: "I'm going aboard the ship and try to get him to come ashore." Upon rejoining the group, Ramsay stated: "The only way to get him is to go aboard the ship." Ramsay left the group a third time, going in the direction of the ship, but came running back saying: "He is coming." At this juncture a police officer in uniform appeared on the dock. Alberts, with a companion, had left the ship and, upon crossing the dock, entered an automobile and drove away. Sakovitz turned to Wallace and Ramsay saying: "That God damned fink got away." Whereupon Ramsay said to the group: "You had better beat it, split up." They then separated.

On the following day, Sunday, March 22d, the Point Lobos was moored at the Encinal dock in Alameda, it having been moved over night. On the morning of this day, Wallace and Sakovitz met in San Francisco. With them was the

sailor whose name is not given, but who was with them on the previous day. Sakovitz stated: "Well, I have got to go over and get that God damned fink." Whereupon, Wallace spoke up saying: "I don't want to go over." To which Sakovitz replied, "You had better come over if you know what is good for you." The three, Wallace, Sakovitz and the sailor, proceeded to the dock in Alameda. Here Sakovitz gathered up two more sailors from the steamer Arctic. Conner, who had been with them on the previous day then joined the group. After a few minutes Sakovitz asked Conner to go aboard and see if he could locate Alberts. At the same time Sakovitz explained to Conner and the rest of the group where each should station himself should Conner find Alberts aboard. The whole group then went aboard the ship and took their stations as planned. Wallace went to the starboard side of the ship near the passageway in which Alberts' stateroom was located, and was later seen with his hand on the knob of Alberts' stateroom door; Sakovitz to the forward end of the passageway close to Alberts' door, facing Conner; and the others took various positions about the deck of the ship.

When Alberts came aboard with Captain Odeen, he entered his stateroom. Conner gave a signal with his hand to Sakovitz. In a few minutes a noise emitted from the stateroom which Alberts had entered, and which was described by Wallace as sounding like "ugh, ugh, ugh". In a matter of seconds Sakovitz emerged with blood on his hands and told Wallace: "You had better beat it."

After the killing the group met at a nearby warehouse, where Sakovitz told them "it is all over with—beat it." The group then dispersed, but later Sakovitz, Wallace and the unidentified sailor met in a hotel in San Francisco where Sakovitz lived, and at that time Sakovitz told them that they were in trouble and he gave Wallace $10, which he said had been sent by King so that Wallace could leave San Francisco. Thereafter Sakovitz, Wallace and the sailor met in Salt Lake City, in Chicago, and again in New York; and while in New York Sakovitz told Wallace that he knew friends who could get papers so that he could go to Russia; but nothing further was done about the plan. In the meantime, on the day following the killing, Ramsay returned to Murphy part of the $30 which had been given to Ramsay

the day before the killing at King's request, Ramsay stating that he was "hot". Murphy afterwards asked King how the money should be entered in the books, and King told him they would discuss the matter later. Two months after the killing and on May 31, 1936, Wallace returned to San Francisco, saw Murphy and told him he wanted to see King; but Murphy informed him that King was away. Wallace then asked Murphy if he knew that he, Wallace, was "in that bunch on the Point Lobos job". Murphy replied he did not; whereupon Wallace told him that King had sent him and Sakovitz and the sailor over to the Point Lobos and that after the job was over they fled; and that not having heard from King, he came back to "find out what the score was". The next morning Ramsay was brought to the hotel room where Wallace was staying. Murphy was present; and Ramsay, upon seeing Wallace, turned pale and said, "For God's sake, what are you here for?" and Wallace replied "I am here to find out what the score is". Ramsay and Wallace then engaged in a conversation, in Murphy's presence, wherein Ramsay told Wallace he didn't think the police were wise, that nobody knew who did the job, and that he, Ramsay, had been thoroughly questioned by the police.

King was absent from the city at that particular time, so Murphy made an appointment to see one Lawrence Ross, and at the conference which followed Murphy told Ross who Wallace was and about his participation in the killing of Alberts; thereupon Ross suggested that Wallace go back east and notify Murphy, addressing him under another name, where he would be located about July 2d. Ross also suggested that Wallace's membership book be "phoneyed" so that Wallace could go back and work on east coast ships. In accordance with Ross' suggestions, Murphy made out a new union book for Wallace, under the name of George White, with a notation showing the payment of all dues to July, 1936; and he asked Wallace to write to him under the name of Albert Diekman. Wallace then, for the second time, left San Francisco for New York. Upon King's return Murphy told him of Wallace's visit, and King told Murphy that Wallace was a "damn fool" and "should not have come out here". He further stated that he had sent Sakovitz and Wallace to the Point Lobos to "tamp up" on Alberts,

but "the damn fools had gone too far and killed him". Subsequently Wallace wrote to Murphy telling him to have King write to him. Wallace signed his own name to the letter and Murphy handed the letter to King, and when King saw the signature he told Murphy that Wallace was crazy for signing his own name; that it was very dangerous because the authorities might have gotten hold of the letter; that Wallace was a menace and it would be a good thing if something happened to him. Later Murphy received a second letter from Wallace signed "George White", asking why King had not written to him, and stating that if King did not take care of him he would "cut the line—you know what I mean". When Murphy gave King this letter, King again said that Wallace was a fool and a menace and that he wished he would not write. On August 1st, Wallace again returned to San Francisco, and went to King's hotel. He told the clerk his name was Wallace and that he wanted to see King; and the clerk told him King was not home. Across the street Wallace met a man named O'Neill who told him King did not want to see him and did not want him to be seen by anyone who knew him; so O'Neill took Wallace to a hotel, gave him $50 and told him to keep off the street and avoid seeing anyone. O'Neill also told him that Ross had tried to make arrangements for Wallace to go to Russia, but was unable to do so, and suggested that Wallace go to Mexico.

Shortly after Wallace's arrival in San Francisco on this occasion, King told Murphy that Wallace was in town again and that he was planning to get him into Mexico; and he instructed Murphy to give his dues stamp to O'Neill because he wanted Wallace's book to be stamped ahead. Thereupon, O'Neill took Wallace's union book and returned it to him about six hours later with the dues marked paid up to April, 1937, and although Murphy's initials "A. M. M." were attached to the union book they were written by someone else.

Wallace then again left San Francisco and went to El Paso, and from there to Del Rio, and then on to Brownsville, Texas. While in Brownsville he attempted to go to Mexico City, but not having sufficient money to get across the border, he wrote a letter to Murphy, under the name of Albert Dickman, requesting that Murphy give the letter to King and that King write to him at Brownsville, Texas. Upon receipt of the letter Murphy told King about it and King said

he would take care of it, but he never did. Shortly afterwards Murphy learned through his room mate that officers from the district attorney's office were in the building; and he related to them what he knew about the case; and within a few days thereafter Wallace was apprehended in Brownsville, and Conner taken into custody in Seattle.

Many of the facts above narrated were established by the testimony of Wallace, and appellants contend as one ground for reversal that his testimony is without sufficient corroboration to entitle it to consideration. We are unable to sustain this view.

As to the appellant Conner, the record shows, as stated, that he confessed his part in the affair. In this regard he admitted to the district attorney that on the morning Alberts was killed he pointed out Alberts' stateroom to Sakovitz, just after Alberts entered it, but he claimed that he understood Sakovitz was only going to beat up Alberts. That this confession was voluntarily made and properly admitted in evidence finds ample support in the record, and where, as here, there is independent proof of the *corpus delicti*, a conviction based on confession will stand although uncorroborated by any other evidence. (*People* v. *Ruef*, 57 Cal. App. 230 [206 Pac. 775]; *People* v. *Vuyacich*, 57 Cal. App. 233 [206 Pac. 1031]; *People* v. *Ford*, 25 Cal. App. 388 [143 Pac. 1075].) And as to the appellants Ramsay and King, it appears that corroborative testimony was given by several witnesses. A man named Jackson testified that he saw the appellant Ramsay on the Point Lobos after 12:00 o'clock noon of Saturday, March 21st, and that he saw him inside the door of a warehouse on the dock after 3:00 o'clock P. M. of the same day, although Ramsay testified he left the ship and the dock about 2:15 P. M. of that day. Another witness, named Showell, testified that he and Alberts left the Point Lobos together about 3:30 P. M. on Saturday and drove away in Showell's car. Officers on the Point Lobos testified that they saw Wallace on the Point Lobos about 10:15 Sunday morning, March 22d, and that they saw both Sakovitz and Wallace leave the ship about 11:15 of the same morning. Moreover, there was the testimony given by Murphy describing the meeting between Ramsay and Wallace in the hotel room, as to Ramsay's startled demeanor and exclamations when he first saw Wallace there;

and as to the incriminating conversations carried on between Ramsay and Wallace in which they related circumstances leading up to and following the killing, wherein Ramsay stated, in addition to what has already been mentioned, that they missed Alberts the first day, that they were waiting for him to come down the gangplank and were just ready "to take him" when a policeman appeared and "they had to scram". Murphy also testified as to the circumstances of King having given Ramsay the $30 for the "expedition across the bay", and as to King's statement as to the purpose of such payment; also as to King's statements, activities, and alarm concerning Wallace's subsequent visits to San Francisco, and the correspondence Wallace tried to carry on with King, through Murphy; also, as to the preparations and plans King endeavored to carry out to keep Wallace away from California; and particularly King's statement to Murphy to the effect that he had "sent Sakovitz and Wallace to the Point Lobos to tamp up on the chief and the damn fools had gone too far and killed him". Wallace's testimony was further corroborated in many other details, by the testimony of other witnesses, and by documentary evidence; but it would seem to be unnecessary, in view of the foregoing, to further elaborate thereon.

The further contention is made that the testimony of Murphy is not competent corroborative evidence for the reason that he, too, was an accomplice. The evidence conclusively shows, however, that his only connection with the case prior to the killing of Alberts was when he handed the $30 of union money to Ramsay at King's direction. The governing factor in determining whether a witness is, or is not, an accomplice, is the part which he played in the perpetration of the crime. To establish him as an accomplice, a corrupt cooperation in the commission of the crime must be shown. Aid or assistance given after the commission of the crime is of no avail as it would constitute an independent crime on the part of the witness, and make him in no way responsible for the crime originally committed. (*People* v. *Collum*, 122 Cal. 186 [54 Pac. 589].) That Murphy handed $30 of union money to Ramsay at King's request is conceded. Nor is it controverted that Murphy asked King the purpose for which the money was to be used at the time it was handed to Ramsay. There is no direct evidence tending to show

that Murphy intentionally furthered the undertaking of the defendants or that he corruptly cooperated with them in the slightest degree. Where the acts and conduct of the witness are admitted, it becomes a question of law for the court to say whether or not those acts and facts make the witness an accomplice. (*People* v. *Coffey,* 161 Cal. 433 [119 Pac. 901, 39 L. R. A. (N. S.) 704] ; *People* v. *Schumann-Heink,* 98 Cal. App. 225 [276 Pac. 625] ; *People* v. *Allison,* 200 Cal. 404 [253 Pac. 318].) Whenever there is any dispute about what a witness did or did not do, which if he did do would make him an accomplice, this issue of fact should be submitted to the jury under proper instructions, and the finding of the jury upon such an issue will not be disturbed on appeal. (*People* v. *Coffey, supra.*) In this case any inference of the complicity of Murphy deducible from his acts and conduct was resolved adversely by the jury. The trial court gave them proper instructions defining an accomplice, informing them of the necessity which the law imposes for the corroboration of the testimony of a witness who is such an accomplice, and the kind and degree of proof required to establish a sufficient corroboration. On the issue of the complicity of Murphy their finding cannot be disturbed on the showing here made.

In urging their point that the testimony of the defendant Wallace is not sufficiently corroborated to entitle it to consideration, the appellants most vehemently disavow their former associate and characterize him as a person wholly unworthy of belief. The tests to be applied in determining the sufficiency of the corroboration of the testimony of an accomplice are aptly set forth in the case of *People* v. *Collier,* 111 Cal. App. 215 [295 Pac. 898]. The court there reviewed the leading cases dealing with the question of the sufficiency of the corroboration of the testimony of an accomplice and, in view of the importance of the question here, we quote from the opinion at length. The court there stated, at page 228: "There is no hard-and-fast rule by which it can be determined what evidence is sufficient and what is insufficient when the appellate court approaches the subject as a trier of fact in the place and stead of the jury. The code section is plain, section 1111 of the Penal Code provides: 'A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend

to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.' In *People* v. *Davis, supra* (210 Cal. 540 [293 Pac. 32]), the Supreme Court pointed out that the rule had always been adhered to that 'the corroborating evidence must do more than raise even a grave suspicion of defendant's guilt' and *People* v. *Kempley*, 205 Cal. 441 [271 Pac. 478], and other authorities were cited. Of course, evidence which merely creates a suspicion would not be sufficient else the provisions of section 1111 would be meaningless, and, though we find many 'negative' authorities on what is insufficient under the section, it is difficult to find the authorities which declare what is sufficient. *People* v. *Negra*, 208 Cal. 64, 69 [280 Pac. 354, 356], comes closest to the line where it is said: 'And if there is other evidence which measures up to the requirement of the code (*supra*), tending to connect the defendant with the commission of the crime charged, then such testimony of the accomplice is to be considered by the jury, as is any other testimony, and must be given the weight to which the jurors may conclude that it is entitled. (*People* v. *Hoosier*, 24 Cal. App. 746 [142 Pac. 514].) The evidence tending to connect a defendant with the commission of the crime may be slight and, when standing by itself, entitled to but little consideration. (*People* v. *McLean*, 84 Cal. 480 [24 Pac. 32].) The law does not require that the evidence necessary to corroborate the testimony of an accomplice shall tend to establish the precise facts testified to by the accomplice; and strong corroborative testimony is not necessary to support a judgment of conviction founded on the testimony of an accomplice. Even though circumstantial and slight, the evidence is, nevertheless, sufficient if it tends to connect the accused with the commission of the offense. (*People* v. *Martin*, 19 Cal. App. 295 [125 Pac. 919].) The defendant's own statements and admissions, made in connection with other testimony, may afford corroboratory proof sufficient to sustain a verdict. (*People* v. *Armstrong*, 114 Cal. 570 [46 Pac. 611]; *People* v. *Sullivan*, 144 Cal. 471, 473 [77 Pac. 1000].) It is not necessary that the corroborating evidence should go so far as to establish by itself, and without the aid of the testimony of an accomplice, that the defendant committed the offense charged.'

"The foregoing quotation was quoted with approval by the Supreme Court in *People* v. *Davis, supra,* with the explanation that it was not intended to hold that the corroborating evidence was sufficient if it merely raises a suspicion of defendant's guilt. But, though evidence which merely creates a suspicion is insufficient because of the statutory presumption of innocence of crime, we must not overlook the weight of an inference which is 'a deduction which the reason of the jury makes from the facts proved' (Code Civ. Proc., sec. 1958). Hence, when the question of the sufficiency of the corroborating evidence is before the appellate court we cannot approach it in the same manner the jury would do, but we must assume that the jury drew all inferences from the facts proved as 'the reason of the jury' might sanction. If, therefore, facts are in evidence which would reasonably support an inference that defendant was involved in the conspiracy alleged and the jury so found it is not the province of the appellate court to weigh the evidence or to determine in its mind what weight it would give to such evidence.

"The code section expressly states that the corroborating evidence 'shall tend to connect the defendant with the commission of the offense'. This does not mean that such evidence shall connect the defendant beyond all reasonable doubt. Such is the rule in *People* v. *Martin,* 19 Cal. App. 295, 301 [125 Pac. 919], which is quoted with approval in *People* v. *Negra, supra.* Therefore, unless the appellate court can say that the corroborating evidence is either incompetent or is, as matter of law, of such a character that it could not tend to connect defendant with the commission of the offense and could not reasonably support an inference of such connection, the finding of the jury on that issue should not be disturbed."

Viewing the statements and admissions of the appellants in connection with the other evidence in the case produced independently of the defendant Wallace, we cannot say that the whole does not tend to connect the appellants with the commission of the offense charged, and that the finding of the jury in this particular is without support.

■ Appellants also urge with much force the further contention that in any event the evidence taken as a whole is not sufficient to support the verdict against them. It is

maintained that the killing of Alberts was not the natural or probable consequence of any act on the part of any of them. In this connection it is argued that the evidence discloses nothing more than a plan to subject the decedent to a simple assault. The acts of beating and stabbing Alberts to death are denounced as the independent products of the minds of Sakovitz and Wallace, foreign to and outside of any common plan or design, advised, counseled or joined in by the appellants. The claim is also made that the evidence discloses only an undertaking to commit a misdemeanor and consequently none of them can be held guilty of any crime greater than manslaughter.

In support of this last contention they rely upon the case of *People* v. *Munn*, 65 Cal. 211 [3 Pac. 650]. The facts in that case show that two individuals became engaged in an altercation in a bar room. One man struck the other above the temple with his fist. The man who was struck died later as the result of the blow. The court held that since death was not intended, and since the assailant intended and actually made only a simple assault, although death did flow from it, he could be held for manslaughter only. This holding is in consonance with the provisions of section 192 of the Penal Code defining manslaughter.

In the present case there is presented no question of death resulting from the commission of a simple assault or occurring in the commission of a misdemeanor. There is here a death resulting from the use of a deadly weapon which the appellants say they never intended. Such weapon was, however, actually used, and by one who joined with them in the plan to beat up the deceased, which plan they counseled. The question is whether the use of such a deadly weapon upon the person of Alberts and his resulting death was a natural or probable consequence of the plan or agreement among the actual assailants and the appellants for which the appellants may be held liable, two of them, Ramsay and King, not being present.

The character of the plan is of great importance. Here, several men set out to beat up another. In the words of King, he "sent them over to tamp the chief". Preparations were made for trouble. It was known that he was vigorous and strong. One, at least, prior to setting out on the expedition, equipped himself with a bludgeon. At the scene of

the expected trouble others were asked to stand by. Not being able to get at the victim the first day, the majority returned the second day and proceeded to the victim's place of abode aboard ship. They prepared, and were prepared, to meet force with force and to overcome resistance at any cost. The natural and probable consequence of such an undertaking is homicide, and the homicide here committed by one of the conspirators is nothing less than murder. All who combined to commit the unlawful act of violence are equally guilty. The law makes no distinction between them and each is responsible for the act of any other of the party in the prosecution of the original design. All joining in the enterprise are as guilty of murder as the person who actually caused the death. (*People* v. *Creeks,* 170 Cal. 368 [149 Pac. 821]; *People* v. *Ford, supra; Peden* v. *State,* 61 Miss. 267.)

In such cases evidence of a conspiracy is not considered for the purpose of establishing the existence of a conspiracy as such, but to show the circumstances under which the homicide was committed. The law is that when one person unites with other persons in an enterprise to commit an unlawful act, whether a felony or a misdemeanor, with the intention to resist all opposition by force, and murder is committed by some one of the party in the furtherance of the unlawful design, he is as guilty as the person actually wielding the weapon; and particularly where, as in this case, the means to be used by the conspirators were not specifically understood or agreed upon and at least some of the persons before setting out upon the unlawful mission prepared for trouble with the knowledge and consent of all. (*People* v. *Ford, supra.*)

The existence of a conspiracy to commit an unlawful act need not be proven by direct evidence. As is said in *People* v. *Donnolly,* 143 Cal. 394 [77 Pac. 177]: "From the secrecy with which unlawful undertakings are adopted it would be generally impossible to make such proof by direct testimony." It may be inferred from circumstances, as by the number, aims and behavior of the parties at and before the commission of the crime. Evidence may be given of any facts from which the existence of a conspiracy may be fairly deduced or logically inferred. The jury may likewise determine from all of the facts in the case whether the crime

charged is the natural and probable consequence of the unlawful design. The rule is stated in *People* v. *Kauffman,* 152 Cal. 331, 335 [92 Pac. 861], as follows: "But whether or not the act committed was the ordinary and probable effect of the common design or whether it was a fresh and independent product of the mind of one of the conspirators, outside of, or foreign to, the common design, is a question of fact for the jury. (*Bowers* v. *State,* 24 Tex. App. 542 [5 Am. St. Rep. 901, 7 S. W. 247]; *Spies* v. *People,* 122 Ill. 1 [3 Am. St. Rep. 320, 12 N. E. 865, 17 N. E. 898]), and if there be any evidence to support the finding of the jury on this question, its determination is conclusive." In this case there is ample evidence from which the jury were warranted in concluding that the killing of Alberts was the natural and probable consequence of a conspiracy on the part of all the defendants to commit an unlawful assault upon him, and the finding of the jury upon this question of fact is conclusive on appeal.

The numerous cases cited by appellants in support of the proposition that the criminal responsibility of aiders and abettors—accessories before the fact at common law—is no greater than the intent formed by them, and that this intent is limited to the particular criminal act contemplated, do not go to the point that such an accessory is not liable for all the natural and probable consequences attendant upon the commission of the contemplated act. These cases are authority only in support of the rule that one is not bound by the act of another foreign to and different from the act counseled and advised. The guilt of an accessory in the crime actually committed, though not advised, is illustrated in the case of *Regina* v. *Bernard,* 1 F. & F., 240, 242: " ' " . . . As if A. advised B. to rob C., and in robbing him B. kills him, either upon resistance made, or to conceal the fact; or if A. solicit B. to burn the house of C., and B. does it accordingly, and the flames taking hold of the house of D., that likewise is burnt; in these cases A. is accessory to B. both in the murder of C. and in the burning of the house of D.; the events, though possibly falling out beyond his original intention, were, in the ordinary course of things, the probable consequences of what B. did under the influence and at the instigation of A." ' "

That one is not liable who has counseled a particular criminal act, and the perpetrator has committed a different one not falling within the probable consequences of that advised, is illustrated in note 37, 16 Corpus Juris, 135, as follows: "If one advises another to beat a man and the latter dies as the result of the beating, it is murder, and the adviser is an accessory to the murder; but if the advice is to burn a house and the person advised breaks in and commits larceny therein, but does not burn it, the adviser is not an accessory to the burglary, for that is a distinct and separate offense. (*Reg.* v. *Henry*, 9 C. & P., 309, 38 ECL 187; 4 Blackstone Comm., p. 37; 1 Hale P. C., p. 617.)"

■ Complaint is made that the prosecution proceeded upon a dual theory of guilt, viz., that the appellants were guilty as aiders and abettors and were likewise guilty as coconspirators, and that the court committed error in instructing the jury accordingly. Under the charge in the indictment it is immaterial whether the defendants were proved guilty by showing that they were aiders and abettors or coconspirators. The prosecution was not limited to either theory, but was entitled to make proof of guilt by any evidence competent to establish the crime charged, and was likewise entitled to an instruction permitting the jury to determine the ultimate fact of guilt without limitation to any specific theory or aspect of the case. (*People* v. *Burke,* 18 Cal. App. 72 [122 Pac. 435].) It was proper for the court to instruct the jury on as many theories as were logically deducible from the evidence, and it was for the jury to say from all the circumstances connected with the commission of the act whether the defendants were to be held guilty or not guilty as principals in the crime. (*People* v. *Quimby,* 6 Cal. App. 482 [92 Pac. 493]; *People* v. *Byrnes,* 30 Cal. 206; *People* v. *Sica,* 76 Cal. App. 648 [245 Pac. 461]; *People* v. *Burdg,* 95 Cal. App. 259 [272 Pac. 816].)

In this state those persons who aid and abet in the commission of a criminal offense, though not being present, are liable for all the natural and probable consequences incident to the commission of the act which they have counseled or advised. As at common law, the nature of the crime actually committed, and not the act contemplated, fixes and determines the liability and character of guilt not only of him who committed the act, but of those who counseled him to proceed.

One who would have been an accessory before the fact at common law is triable and punishable as a principal under our statutes, and, there now being no such offense as accessory before the fact, the jurisdiction is in the county in which the offense is committed. (Pen. Code, sec. 792.) The case of *People* v. *Huling*, 71 Cal. App. 144 [234 Pac. 924], cited by appellants, holds merely that since all of the acts of Huling were done after the initial acts of Alford in committing the offense, he could not be held as a principal and would at most be but an accessory after the fact, an accessory under our statutes, and, as such, could be tried only in Los Angeles County where his acts were done.

Furthermore, in this state the responsibility of one who has counseled and advised the commission of a crime, or engaged in a criminal undertaking, does not cease, unless within time to prevent the commission of the contemplated act he has done everything practicable to prevent its consummation. It is not enough that he may have changed his mind, and tries when too late to avoid responsibility. He will be liable if he fails within time to let the other party know of his withdrawal, and does everything in his power to prevent the commission of the crime. (*People* v. *Ortiz*, 63 Cal. App. 662 [219 Pac. 1024]; 16 Cor. Jur. 137.)

If the actual perpetrator of a homicide done in the furtherance of the common criminal undertaking is guilty of murder, all who have joined with him and who have not withdrawn from the undertaking, even though not present at the time of the actual killing, are likewise guilty of murder.

Nor do we find any error in the failure to instruct the jury with reference to manslaughter. Appellants concede the killing to be murder, but deny responsibility on the ground that it was never intended by them. This position, as heretofore pointed out, is untenable. Moreover, manslaughter is a crime distinct from murder, but may, however, be included in it. It is distinguished from murder by the absence of malice. To constitute murder the existence of malice is indispensable, and any unlawful killing of a human being with malice aforethought is murder. Section 188 of the Penal Code provides that malice may be express or implied, and that ''it is implied, when no considerable provocation appears, or when the circumstances attending the

killing show an abandoned and malignant heart''. All murder, except that defined by section 189 of the Penal Code to be murder in the first degree, is murder of the second degree, and if the killing is not one so defined as murder of the first degree, and no considerable provocation appears therefor, or the circumstances show an abandoned and malignant heart, it is murder in the second degree. (*People* v. *Ford, supra,* p. 401.) There is no evidence of provocation for the killing of Alberts. The circumstances show nothing but an abandoned and malignant heart. Malice is, therefore, implied.

The rule is well established that when the evidence clearly shows that a defendant, if guilty at all, is guilty of murder, an instruction upon manslaughter should not be given. (*People* v. *Turley,* 50 Cal. 469; *People* v. *Chaves,* 122 Cal. 134 [54 Pac. 596]; *People* v. *Shannon,* 203 Cal. 139 [263 Pac. 522].) Under the circumstances of this case it was not error for the trial court to omit or refuse to instruct upon the subject of manslaughter.

In addition, all proper instructions requested by appellants were either given or included in the charge of the court, and all principles of law necessary for a proper understanding of the entire case were properly instructed upon.

The contention is made that the comment of the trial court on the evidence was unfair and prejudicial to the defendants. The court in commenting on the evidence is not required to sum up all of the evidence, both favorable and unfavorable, or comment on the testimony of every witness in the case. The court may make such comment as in its discretion it may deem necessary for a proper determination of the case, so long as material evidence is not withdrawn from the consideration of the jury, nor an attempt made to control the verdict. In all such cases it should make clear to the jury that they are the final and exclusive judges of all questions of fact and the credibility of witnesses. (*People* v. *DeMoss,* 4 Cal. (2d) 469 [50 Pac. (2d) 1031]; *People* v. *Ottey,* 5 Cal. (2d) 714 [56 Pac. (2d) 193]; *People* v. *Gosden,* 6 Cal. (2d) 14 [56 Pac. (2d) 211].) Here the trial court repeatedly so admonished the jury, and the comment was a fair statement of the court's view of the evidence. The comments at all times were advanced only as the view of the trial judge, without in any manner attempting to

infringe upon the powers of the jury, and in our opinion did not violate the rights of any of the defendants.

 Error is claimed because of the refusal of the trial court to grant separate trials. Since the enactment of section 1098 of the Penal Code, in its present form, a defendant jointly charged is not entitled to a separate trial as a matter of right, and the question of severance rests entirely in the discretion of the trial court. (*People* v. *Thomas,* 135 Cal. App. 654 [27 Pac. (2d) 765].) It is not an abuse of discretion to refuse to grant a motion for a severance because damaging testimony or the admission or confessions of a codefendant might be admitted in evidence against such codefendant, and not be admissible against the moving defendant. (*People* v. *Swoape,* 75 Cal. App. 404 [242 Pac. 1067]; *People* v. *Tinnin,* 136 Cal. App. 301 [28 Pac. (2d) 951].)

 The cross-examination of the witness Slade was not unduly limited. Upon the subject of his residence, he testified at length that he had been living with an attaché of the district attorney's office up to the very day he took the witness stand. In addition he was cross-examined exhaustively and answered all questions as to his employment and whereabouts from the time of the murder until he was called as a witness. The defendants were permitted by prolonged cross-examination to bring before the jury the fact that he had been kept by the district attorney's office in Alameda County for a considerable period of time continuously up to his taking the witness stand. The question, ''Where do you live today?'' was asked after such exhaustive examination, was not a preliminary question, and the rule stated in *Alford* v. *United States,* 282 U. S. 687 [51 Sup. Ct. 218, 75 L. Ed. 624], does not apply.

 The appellants have raised the point that the trial jury list, from which the panel and the jury were ultimately selected, was not made up according to the requirements of section 204b of the Code of Civil Procedure, and in this particular have attacked the procedure followed by the jury commissioner in making up and submitting such trial jury list. No bias or prejudice on the part of the commissioner is asserted, and the only error claimed is in his method of procedure in compiling the list. Unless there be a material departure from the provisions of the statute which militates to the prejudice of a defendant, no error can be claimed in

presenting a panel from which a jury is to be selected. (*People* v. *Richards*, 1 Cal. App. 566 [82 Pac. 691].) Here we find no such substantial departure.

 Upon their motions for a new trial, the appellants urged upon the trial court, and have made the point here, that there was misconduct on the part of the jury, in that one of the jurors, Mrs. Julia Vickerson, intentionally concealed certain facts upon examination on *voir dire*, which rendered her disqualified to act as a juror in the case. In support of this contention, an affidavit was filed alleging the relationship of attorney and client between Charles Wehr, deputy district attorney, and the juror, and the juror's husband, Dr. J. I. Vickerson. The allegations of this affidavit were contradicted by several affidavits filed counter thereto and by the testimony of the juror, her husband and Mr. Wehr, as well as the testimony of several other witnesses, taken upon the hearing of the motion. Upon her examination on *voir dire*, the juror answered all questions propounded to her fully and fairly, and then testified that she knew Mr. Wehr, but that she knew Mr. Harris, attorney for one of the defendants, slightly better. Mere acquaintanceship with one or more of the attorneys in the case is not a ground of disqualification, and neither is the fact that a prospective juror is a client of an attorney a ground of disqualification. (Pen. Code, sec. 1074, subd. 2; *People* v. *Conte*, 17 Cal. App. 771 [122 Pac. 450].) It does not appear that a prejudiced state of mind existed on the part of the juror which would deprive the defendants of a fair trial, and upon extensive evidence the trial court determined that such prejudice did not exist and was not concealed. This finding of the trial court will not be disturbed on appeal. (*People* v. *Zirbes*, 6 Cal. (2d) 425 [57 Pac. (2d) 1319]; *People* v. *Galloway*, 202 Cal. 81 [259 Pac. 332].)

Appellants' other and varied specifications of error based on objections running through some four thousand pages of transcript, and discussed in half that number of pages of printed matter presented here in the form of briefs, have been carefully considered and appear to be without merit. From a consideration of the whole record we are convinced that no prejudicial error was committed in the

rulings of the court and that all questions of fact involved were submitted to the jury under proper instructions.

The judgments of conviction, and the orders appealed from are, and each of them is, affirmed.

A petition for a rehearing of this cause was denied by the District Court of Appeal on January 12, 1939, and an application by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on January 26, 1939.