[Crim. No. 7435.    Second Dist., Div. One.    Nov. 30, 1961.]

THE PEOPLE, Plaintiff and Respondent, v. HERBERT THAD JONES, JR., et al., Defendants and Appellants.

James Edward Morgan and Charles B. Stewart, Jr., for Defendants and Appellants.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and George W. Kell, Deputy Attorney General, for Plaintiff and Respondent.

FOURT, J.—This is an appeal by each of the defendants from a judgment of conviction of conspiracy to commit burglary and robbery and of robbery in the first degree.

In an information filed in Los Angeles County on June 2, 1960, the defendants were charged in count 1 with conspiracy to commit burglary and robbery on or about the 21st day of March, 1960. The overt acts were alleged as follows:

### Overt Act No. 1

That defendants Herbert Thad Jones, Jr., and Horace Lee Williams met with Sanath Kumar on March 21, 1960.

### Overt Act No. 2

That defendants Herbert Thad Jones, Jr., and Horace Lee Williams met with Sanath Kumar on April 5, 1960.

### Overt Act No. 3

That on April 8, 1960, defendants Herbert Thad Jones, Jr., and Horace Lee Williams rode in a 1960 Lincoln in the vicinity of 34th and Central.

### Overt Act No. 4

That on April 8, 1960, defendant HERBERT THAD JONES, JR., had a telephone conversation with Sanath Kumar.

### Overt Act No. 5

That on April 10, 1960, defendants HERBERT THAD JONES, JR., and HORACE LEE WILLIAMS went to the liquor store at 3040 South Main Street.

### Overt Act No. 6

That on April 10, 1960, defendant HORACE LEE WILLIAMS entered the liquor store at 3040 South Main Street.

### Overt Act No. 7

That on April 10, 1960, defendant HERBERT THAD JONES, JR., had a telephone conversation with Sanath Kumar.

### Overt Act No. 8

That on April 10, 1960, Danny King (deceased) entered the liquor store at 3040 South Main Street.

### Overt Act No. 9

That on April 10, 1960, defendant HORACE LEE WILLIAMS had a telephone conversation with Sanath Kumar.

### Overt Act No. 10

That on April 10, 1960, defendants HERBERT THAD JONES, JR., and HORACE LEE WILLIAMS met with Danny King (deceased) and Sanath Kumar, at 2415 West Boulevard.

### Overt Act No. 11

That on April 11, 1960, defendants HERBERT THAD JONES, JR., and HORACE LEE WILLIAMS met with Danny King (deceased) and Sanath Kumar at 2415 West Boulevard.

## Overt Act No. 12

That on April 12, 1960, Danny King (deceased) entered the liquor store at 3040 South Main Street.

In count 3 the defendants were charged with the robbery of S. Kumar on April 12, 1960. It was further charged that the defendants were armed with a deadly weapon, namely, a .38 caliber revolver at the time of the robbery. The defendants were found guilty as charged in counts 1 and 3, and overt acts 3, 5, 6 and 8 were found to be true. A motion for a new trial was denied. The defendants were sentenced and this appeal followed. The defendants were found not guilty of a charge of murder, which was set forth in count 2 of the information and not guilty of a burglary charge set forth in count 4 of the information.

A résumé of some of the facts is as follows:

Sanath Kumar was employed as a clerk in a liquor store located at 3040 South Main Street. Kumar was introduced to defendant Jones by defendant Williams on or about March 8, 1960, at or about which time Jones asked Kumar if he would cooperate with them in a holdup of the liquor store. Kumar was questioned by the defendants as to how much money was kept on hand, the hours during which the store was open and when he worked alone. Kumar reported the talks to a policeman friend of his of the Newton police station. After a further talk with the officers Kumar agreed to cooperate with the police in an effort to catch the defendants. Thereafter Kumar talked with the defendants and they frequently came to his home about the matter of robbing the liquor store or the liquor store proprietor. The defendants made suggestions to Kumar as to how he could protect himself and be in the clear if he would but cooperate with them; for example, that he should put the money in a paper bag when no one else was in the store, deliver over to them the money and then wait several minutes, after which he could turn in an alarm and pretend to have been robbed. Kumar was told how to scream, to act nervous and what to tell the officers; for example, to give a bad description of the person who had come into the store, saying that it was a Mexican with a gun and telling the police the bandit went in the direction opposite to the real one taken by the person who would take the money. Kumar advised the defendants that his employer carried several thousand dollars from the bank on certain days of the week.

It was first agreed that the defendants would rob Kumar's employer on his way back from the bank on April 8, 1960, but Williams on that date thought the area was staked out with police officers and the robbery was not committed. On the next day Kumar was consulted by the defendants and defendants were told that Kumar would open the store on Sunday morning and would be alone until 11 a. m. when the delivery boy would arrive. Plans were then made to stage a robbery at the store at a few minutes past 6 a. m. of that Sunday. Williams came to Kumar's home about 2 a. m. on Sunday morning, April 10, 1960, with two women and stated to Kumar in effect that the robbery had to take place because he needed the money and was in bad shape. Kumar opened the store as contemplated on Sunday morning and shortly thereafter Williams entered and said, "There is a truck across the street, cool it, we don't trust it ——." Williams also indicated that there were police close by whereupon he, Williams, purchased a bottle of wine, made a telephone call and walked out of the store. Williams stated before leaving the store, however, that he would check out the police squad car in the area and if everything checked out the robbery would still take place that morning. Jones called on the telephone later and told Kumar that the truck across the street belonged to an engineering company and not to the police, as they had at first feared. Williams indicated that the plan was "still on." Jones again called Kumar on the telephone and asked Kumar to cash $1,000 worth of bad checks which he had made out. The telephone rang again and the delivery boy answered. In approximately 10 minutes, after the telephone call just mentioned, Danny King (whom Kumar had not seen before) walked into the store and purchased some cigarettes and candy and then left. Williams then called on the telephone and asked Kumar why Kumar had failed to "give my man what we had planned?" Kumar explained to Williams that there was some confusion because the previous telephone call had been received by the delivery boy. Williams stated to Kumar, ". . . This man means business, he carries a rod on him all the time. I'm your friend, I have tried to keep your brains from being blown out . . . he is going to come right back and you do what you are supposed to do according to the plans." King shortly thereafter entered the store and exhibited a gun. Kumar said, "All right, let me have the checks, I will cash them for you." King answered, "What checks, just put the money in a paper bag." Kumar again asked for the checks and King then left.

Between 3 and 3:30 p. m. that afternoon Williams called Kumar and directed him to be at a certain address as soon as he left work. When Kumar arrived at the address to which he was directed Jones, King and Williams were there. King asked Kumar why he had failed to cooperate and Kumar related that there were other people in the store and that there was some confusion about the checks.

A new plan was then formulated to hold up the liquor store on the following Tuesday morning. King was to walk into the store about 6:10 a. m. On the next day (Monday), pursuant to the plan, Kumar called Williams and told him everything would go according to the plan. On April 12, 1960, Kumar opened the store at 6 a. m. and a few minutes later King entered, exhibited his gun and ordered Kumar to put some Scotch whisky and the money in a bag and deliver it to him. Kumar did as directed and was then told to turn around and walk to the back of the store. As Kumar walked toward the rear of the store he heard gunshots.

Thomas, a police officer attached to the Newton police station saw Williams cruising in the vicinity of 31st and Main Streets and saw him stop and enter the liquor store. The officer also saw Jones in the vicinity of 31st and Main Streets. At the time and place Thomas masqueraded as a common drunk. While in the store on one occasion Thomas listened in on a telephone conversation between Kumar and an unidentified caller. The voice on the line said to Kumar, among other things, "Man, we got to cool it . . . Can you see that old thing parked across the street? . . . Well, that is the heat . . . your joint is staked out."

On April 12, 1960, Thomas was in the liquor store when King entered, having arrived in an old-model car which was later determined to be owned by Jones. When King entered the store he had a gun in his possession. At the time heretofore indicated Thomas shot King with a shotgun and a revolver.

Rainey, a police officer attached to the Newton station robbery detail, saw King after the shooting. King was bleeding profusely from his left side and the left upper chest regions. Rainey asked King, "Who else is in this with you?" King answered, "Jones and Williams." King then fell back and Rainey concluded that King was dead.

The defense was in effect that it was true that they had planned to rob Kumar's employer on his return from the bank but that there was no talk of robbery of the store, or that if there ever was any such talk they had abandoned any

thought of going ahead with the robbery two days before it was actually committed.

Appellants now contend that (1) the evidence is insufficient to support a finding of conspiracy, (2) the evidence is sufficient to support a finding that they withdrew from the conspiracy, (3) the court erred in admitting the alleged dying declaration of King, and (4) the prosecution failed to prove the offenses as charged beyond a reasonable doubt.

Appellants have cited many cases involving entrapment, however those cases can be of little assistance to them in this particular case. The appellants vehemently deny that they committed any offense or participated therein directly or indirectly. See *People* v. *Johnson,* 99 Cal.App.2d 559 at page 562 [222 P.2d 58]. If the testimony in the record is true then there can be little doubt about the sufficiency of the evidence. There seems to be nothing inherently impossible or incredible as a matter of law in the testimony. The trial judge believed the prosecution witnesses and disbelieved the appellants.

■ With reference to the claim that the appellants withdrew from the conspiracy the judge apparently disbelieved their statements. In any event it is perfectly apparent that the appellants did nothing within their power to prevent the commission of the crime. See *People* v. *King,* 30 Cal.App.2d 185, 204 [85 P.2d 928]; *People* v. *Ortiz,* 63 Cal.App. 662, 670 [219 P. 1024]; *People* v. *Norton,* 161 Cal.App.2d 399, 403 [327 P.2d 87].

■ With reference to the assertion that King's dying declaration was inadmissible apparently upon the ground that no proper showing was made that death was impending, suffice it to say that the record discloses that the two officers were located upon the top of the ice box in the store when King made his entrance, and each of the officers fired a shotgun blast into King from a distance of approximately 30 feet, and one officer shot King "four or five" times more with his revolver. The bare recital of the facts would seem to indicate about as clearly as possible that Danny King, upon being shot in the chest, was very near death. See Witkin, California Evidence, page 295; *People* v. *Cipolla,* 155 Cal. 224, 226, 227 [100 P. 252]; *People* v. *Fain,* 174 Cal.App.2d 856, 860 [345 P.2d 305].

As to the last of appellants' contentions no serious mention is set forth in their briefs with reference to the same. See

*People* v. *Shannon,* 110 Cal.App.2d 153, 155 [241 P.2d 1007] ; *Goldring* v. *Goldring,* 94 Cal.App.2d 643, 645 [211 P.2d 342].

We find no merit whatsoever in any of appellants' contentions.

The judgments are and each of them is affirmed.

Wood, P. J., and Lillie, J., concurred.